(81 P.3d 1243)
No. 90,475

GARY F. JONES, *Appellant*, v. KANSAS STATE UNIVERSITY, *Appellee*.

Opinion filed January 9, 2004.

*Luke B. Harkins* and *Steve A.J. Bukaty*, of Steve A.J. Bukaty, Chartered, of Overland Park, for appellant.

*Richard Seaton*, of the office of University Attorney, Kansas State University, of Manhattan, for appellee.

Before GREENE, P.J., LEWIS and MALONE, JJ.

GREENE, J.: Gary F. Jones appeals from the district court's order affirming the decision of the Civil Service Board (Board), which upheld the termination of Jones' employment as a police officer with Kansas State University (KSU) for gross misconduct or conduct grossly unbecoming a state officer pursuant to K.S.A. 75-2949f(a). We reverse and order Jones' reinstatement.

*Factual and Procedural Overview*

Gary F. Jones was employed as a police officer with the KSU Police Department (Department) since January 1997. On August 26, 2001, Jones stopped a vehicle driven by Gretchen Esping for speeding. At the time of the stop, Student Security Officer Pharaoh Guice also was in Jones' police car.

Most of this stop was recorded by a video camera in Jones' police vehicle. The tape reflects that Esping pulled her vehicle over approximately 6 feet from the curb, parallel to the curb but perpendicular to marked parking spaces. Jones approached and asked for Esping's driver's license and advised her she was going at least 32 in a 20 m.p.h. zone. Jones returned to his vehicle and ran a license check, which revealed that Esping's license had been suspended earlier in 2001. Jones relayed that information to Esping, who claimed she was unaware that her license had been suspended. Jones advised her that he would have to write a citation and that

he could not let her drive, but she could ask a friend to drive her car home for her. Esping became upset and began crying.

Jones returned to his vehicle and asked the dispatcher to double-check the suspension. After the dispatcher confirmed the suspension, Jones advised Esping that he had reconfirmed the suspension and asked for her current address. Jones again returned to his car and wrote the traffic citation for driving with a suspended license. Esping initially refused to sign the citation, claiming she had never been told her license was suspended and she would not sign anything indicating she had driven on a suspended license. After Jones explained several times that signing a citation was not an admission of guilt, Esping finally signed and accepted the citation. Esping was still crying and upset, and she expressed concern for how she would get her perishable groceries to her nearby home, which was apparently located only 100 feet from the scene. Jones offered to drive her to her apartment and to put his card on her car, so it would not get towed. Jones then told Esping, "One second. I want to tell you something. One second." Jones walked back to the police car and directed Guice to turn off the lights, which deactivated the in-car video camera. Nothing more of this stop was recorded.

Jones completed a report of the incident later that day. The report stated, in part:

"At this time I informed the suspect that her license was suspended, and that I would issue her a notice to appear (citation # 6638) and she would be released at the scene, the suspect vehicle was legally parked at the time of the stop so the driver agreed to leave the vehicle where it was until she could have a friend drive her vehicle to her apartment building."

Approximately 1 month later, the Department started an internal investigation into the events of August 26, 2001. The investigator reviewed the videotape and talked with various witnesses, including Jones, Esping, and Guice. Guice indicated that after Jones instructed him to turn off the camera, Jones returned to Esping's car and spoke with her. In her statement, Esping stated that after the camera was turned off, Jones returned to her car and stated, "You give us two minutes to get out of here and then you go park your car in front of your apartment and don't drive it again until this is cleared up." The Esping citation was apparently dis-

missed when it was determined that the purported license suspension was in error.

On December 13, 2001, Department Director Ronnie Grice sent a letter to Gary E. Leitnaker, KSU's Director of the Division of Human Resources, requesting that Jones be terminated. The next day, Leitnaker issued a letter to Jones informing him the Department had requested he be dismissed for gross misconduct or conduct grossly unbecoming a state officer or employee. The reasons stated for the proposed dismissal were that Jones: "(1) submitted false information in a case report of the traffic stop; and (2) violated the in-car camera policy that states, 'every traffic stop shall be recorded until the stop is terminated.' " The letter invited Jones to submit any information he wished the Director to consider. After Jones met with Leitnaker, Leitnaker issued a letter confirming the proposal to dismiss Jones and advising him of his right to appeal to the KSU Classified Employee Peer Review Committee (PRC).

After a hearing, the PRC issued a letter finding that Jones submitted false information in his report and also violated the in-car camera policy. Accordingly, the PRC concurred with the Department's findings and supported the Department's recommendation that Jones be dismissed. Based upon the PRC's findings, Leitnaker dismissed Jones effective January 10, 2002, "for the reason of gross misconduct or conduct grossly unbecoming a state officer or employee." At this point, Jones was advised of his right to appeal to the Board.

At the conclusion of a hearing, the Board unanimously voted to uphold KSU's decision to terminate Jones. In a subsequent written decision, the Board summarized the facts and then concluded that Jones' conduct "constituted gross misconduct or conduct grossly unbecoming a state officer or employee."

Jones filed a timely petition for judicial review in district court, alleging that the Board's findings that he falsified his report and violated the Department's in-car camera policy were not supported by substantial competent evidence and that the Board misinterpreted K.S.A. 75-2949f(a).

After briefing and oral argument, the district court affirmed the Board's decision. In addressing the merits, the district court noted

the Board did not expressly find Jones violated the Department's in-car camera policy. Rather, the district court reasoned that even if the policy was not violated, Jones was terminated because of a question of trust. The court also noted there was evidence to support a finding that Jones included false information in his report of the incident with respect to whether Esping's car was legally parked. The court found this finding was relevant in determining the reasonableness of Jones' termination. Finally, the court concluded the Board applied the correct standard in determining Jones' termination was reasonable and there was sufficient evidence to support the Board's decision.

Jones appeals.

*Standard of Review*

The review of the decision of the Board is controlled by the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq. Kansas Dept. of Transportation v. Humphreys*, 266 Kan. 179, 181, 967 P.2d 759 (1998). In reviewing a district court's decision this court makes the same review of the administrative agency's actions as did the district court. *Connelly v. Kansas Highway Patrol*, 271 Kan. 944, 964, 26 P.3d 1246 (2001), *cert. denied* 534 U.S. 1081 (2002). A rebuttable presumption of validity attaches to all actions of an administrative agency, and the burden of proving arbitrary and capricious conduct lies with the party challenging the agency's decision. 271 Kan. at 965.

When a party challenges an agency's fact findings, the appellate court is limited to ascertaining from the record whether determinations of fact are supported by evidence that is substantial when viewed in light of the record as a whole. K.S.A. 77-621(b)(7). Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. *Newell v. Kansas Dept. of SRS*, 22 Kan. App. 2d 514, 519, 917 P.2d 1357, *rev. denied* 260 Kan. 994 (1996).

When a party disputes the agency's interpretation of a statute, the issue raised is a question of law. *Humphreys*, 266 Kan. at 182.

The interpretation of a statute by an administrative agency charged with enforcing that statute is entitled to judicial deference, but the agency's interpretation is not binding on the appellate court. An appellate court's review of the construction of a statute is unlimited. *Peterson v. Kansas Dept. of Health & Environment*, 31 Kan. App. 2d 13, 18, 59 P.3d 6 (2002).

*Were the Expressed Bases for Jones' Termination Supported by Substantial Competent Evidence?*

KSU's dismissal letter to Jones listed two reasons for the proposed dismissal: (i) Jones submitted false information in his report of the Esping incident; and (ii) Jones violated the Department's in-car camera policy. The PRC cited these same bases for the dismissal. Although the Board's final order is not entirely clear as to the specific factual bases of termination, the conclusions reference only "actions of August 23[*sic*], 2001" and the material findings regarding events on that date state:

"11. Mr. Jones stated in his report that Ms. Esping's vehicle was legally parked at the time of the stop and that the driver had agreed to leave the vehicle where it was until a friend could return the vehicle to her apartment building. Ms. Esping's vehicle was not legally parked at the time of the traffic stop.

"12. The Manhattan city prosecutor requested from the KSU Police Department, a copy of the video and audiotape of the traffic stop of Ms. Esping. In complying with this request, the KSU Police Department discovered that Mr. Jones had turned off the in-car camera prior to the completion of the traffic stop and that this report differed from the information on the tape regarding whether Ms. Esping's vehicle was legally parked at the time of the traffic stop."

The district court focused exclusively on these two bases for the termination, and we likewise limit our focus to these two bases in determining whether they are supported by substantial competent evidence viewed in the light of the record as a whole.

(1) Falsification of Report

There is ample evidence in the record to support the accusation that Jones erroneously characterized the Esping vehicle as "legally parked." The video clearly shows that Esping's car was stopped about 6 feet from the curb, parallel to the curb but perpendicular to the marked parking spaces. Initially he told the PRC that he

considered it legally parked because it was a Saturday and no one would be using the parking spaces anyway. In the Board hearing, Jones testified that he was not thinking about it when he wrote his report. In his brief to the district court, Jones called the inaccuracy "meaningless . . . detail." At least one KSU witness opined that Jones "intentionally falsified" the report. Notwithstanding the clear inaccuracy of the report, Jones has persisted in claiming that he did not *intentionally* falsify the report; he claims that the report was not completed until the end of his shift and that he was more concerned with how the report "would effect [*sic*] her and me."

The district court stopped short of finding that Jones intentionally falsified the report; in fact, the court found only that Jones "included false information in his report of the incident" and that the Board was entitled to consider that finding in determining the reasonableness of Jones' dismissal.

Although Jones' report was erroneous, we find no evidence to suggest that the error was "intentional" or that the report was "falsified," a term which we believe infers an intent to report something known to be untrue. "Intentional" has been defined in criminal law as meaning conduct that is purposeful and willful and not accidental. *State v. Pope*, 23 Kan. App. 2d 69, 74, 927 P.2d 503 (1997). To "falsify" a record implies intentionality consistent with the crime of making false entries or otherwise tampering with a public record with the intent to deceive, injure or conceal wrongdoing. See 18 USCA §§ 1506, 2071, 2073 (2000). Although such intent may be proven by circumstantial evidence (23 Kan. App. 2d 69, Syl. ¶ 2), no such evidence has been cited by KSU; indeed, KSU concedes in its brief on appeal that the Board "did not actually make any such finding [of intentional falsification]."

We conclude that substantial competent evidence supports a finding that Jones' report of the Esping incident included erroneous or inaccurate information that the vehicle was "legally parked." We find no evidence, nor does KSU apparently contend on appeal, that this error was intentional, and we therefore conclude that it would be inappropriate to characterize the inaccuracy as a "falsification." The legal materiality of this error will be addressed below.

## (2) Violation of In-car Camera Policy

KSU has a policy governing the use of in-car camera and audio equipment that states in part: "Officers shall record all traffic stops and pursuits, along with major accidents, where practical. . . . No officer may terminate recording an event of this type, until the event has been concluded." The policy does not further define "event."

It is undisputed that Jones instructed the video camera be turned off before the encounter with Esping was concluded. KSU witnesses testified that, in their opinions, the traffic stop was not concluded when Jones instructed that the recorder be turned off. Jones contends, however, that his traffic stop of Esping was concluded when he returned her license and issued a citation. He admits that after handing this paperwork to Esping, he told her, "One second. I want to tell you something."

Whether a traffic stop has been or should have been concluded as a matter of law requires a constitutional analysis that has spawned a host of contentious litigation and decisional law. See *United States v. Shareef*, 100 F.3d 1491 (10th Cir. 1996); *State v. Mitchell*, 265 Kan. 238, 960 P.2d 200 (1998). We doubt that KSU's policy contemplates that an officer make this determination before deciding when to terminate the in-car video device.

The district court stopped short of finding a violation of KSU's policy, reasoning:

"Violation of the policy is not the issue. Petitioner's actions are the issue, and they are not disputed. After extensive discussion with Ms. Esping over issues related to the citation he issued to her, for driving on a suspended license, Petitioner had the camera turned off so he could further address those same issues off the record. Petitioner would narrow the issue to a *per se* test; if the policy was violated, there might be misconduct, although not gross misconduct, but since it may not have been clearly violated it is not misconduct at all. That approach avoids the principal issue, which is one of trust."

Suffice it to say that for these purposes, there was evidence of camera termination prior to the end of the Esping encounter. Based on the opinion testimony of KSU witnesses regarding the camera termination prior to the conclusion of the traffic stop, there was substantial evidence that Jones technically violated the policy

in terminating the video camera prior to the end of the Esping "event." The legal materiality of this technical violation will be discussed below.

*Did Jones' Actions Constitute Gross Misconduct or Conduct Grossly Unbecoming an Officer Pursuant to K.S.A. 75-2949f(a)?*

Jones contends that the Board and the district court misinterpreted K.S.A. 75-2949f(a) in concluding that his actions constituted "gross misconduct or conduct grossly unbecoming a state officer." Since the legislature has not expressly defined these terms and our appellate courts have never previously construed and applied this statutory subsection, we consider the issue as one of first impression.

The fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. See *State ex rel. Morrison v. Oshman Sporting Goods Co. Kansas*, 275 Kan. 763, 768-69, 69 P.3d 1087 (2003).

" 'In determining legislative intent, courts are not limited to consideration of the language used in the statute, but may look to the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute may have under the various constructions suggested. In construing statutes, the legislative intention is to be determined from a general consideration of the entire act.' [Citation omitted.]" *Board of Lincoln County Comm'rs v. Nielander*, 275 Kan. 257, 265, 62 P.3d 247 (2003).

The Civil Service Act (CSA or Act), K.S.A. 75-2925 *et seq.*, was enacted in 1941. The general purpose of the Act was to "establish a system of personnel administration that meets the social, economic and program needs of the people of the state of Kansas as these needs now or in the future may be established." K.S.A. 75-2925. This system was intended to allow the state to "recruit, select, develop and maintain an effective and responsible work force." K.S.A. 75-2925. Moreover, the Act was designed so that all employment decisions "shall be made without regard to race, national origin or ancestry, religion, political affiliation, or other nonmerit factors," but would "be based on merit principles and fitness to perform the work required and shall provide fair and equal opportunity for public service." K.S.A. 75-2925.

The CSA provides that permanent classified employees may be dismissed because of deficiencies in work performance as set forth in K.S.A. 75-2949e or because of "personal conduct detrimental to the state service" as set forth in K.S.A. 75-2949f. See K.S.A. 75-2949d. Under the latter provision, "[g]rounds for dismissal . . . for personal conduct detrimental to the state service include, but are not limited to, the following: (a) Gross misconduct or conduct grossly unbecoming a state officer or employee." K.S.A. 75-2949f.

K.S.A. 75-2949f was not part of the original CSA. Instead, it was first added in 1981. The original version listed grounds for dismissal to include "[g]ross misconduct or conduct unbecoming a state officer or employee." L. 1981, ch. 334, sec. 5(a). In 1985, the legislature amended the provision to state: "Gross misconduct or conduct *grossly* unbecoming a state officer or employee." L. 1985, ch. 276, sec. 7(a). The 1985 legislature also added what are now subsections (q) and (r) which allow disciplinary action for "gross carelessness or gross negligence" or "grossly improper use of state property." L. 1985, ch. 276, sec. 7(q), (r).

K.S.A. 75-2949f was added after this court's decision in *Swezey v. State Department of Social & Rehabilitation Services*, 1 Kan. App. 2d 94, 562 P.2d 117 (1977). In *Swezey*, this court held:

"Legal cause for dismissal exists if the facts disclose the employee's conduct is of a substantial nature and directly impairs the efficiency of the public service, but there must be a real and substantial relation between the employee's conduct and the efficient operation of the public service; otherwise, legal cause is not present." 1 Kan. App. 2d at 100.

By thereafter enacting K.S.A. 75-2949f, this court subsequently concluded the legislature intended to establish a category of conduct that is per se cause for discipline, obviating the need for the Board to make a case-by-case determination whether there was direct impairment of the public service. *Sanstra v. Kansas Highway Patrol*, 15 Kan. App. 2d 148, 151, 804 P.2d 1009, *rev. denied* 248 Kan. 996 (1991). At no time thereafter has the legislature specifically defined "gross misconduct" or "conduct grossly unbecoming" within the CSA; in fact, the terms "gross" and "grossly" now appear throughout the statute without specific definitions.

Jones argues this court should adopt the definition of gross misconduct from the Kansas Employment Security Law, K.S.A. 44-701 *et seq*. The employment security statutes specifically define "gross misconduct" as "conduct evincing extreme, willful or wanton misconduct as defined by this subsection (b)." K.S.A. 2002 Supp. 44-706(b)(1).

Although KSU suggests that reference to the employment security statutes for these purposes would "be a major distortion of the statute" and that the subject statutes involve "entirely different considerations," we conclude that reference to other statutes employing the identical terms is entirely appropriate when attempting to discern legislative intent. See *Callaway v. City of Overland Park*, 211 Kan. 646, 652, 508 P.2d 902 (1973). In fact, in similar fashion our Supreme Court has found it appropriate to consider statutory language and decisions construing the Workers Compensation Act in addressing statutory construction issues arising from application of the Kansas Public Employees Retirement System Act. See *Shapiro v. Kansas Public Employees Retirement System*, 211 Kan 452, 456-57, 507 P.2d 281 (1973). Just as the court noted regarding the two acts in *Shapiro*, the Kansas Employment Security Law and the CSA have similar purposes—to provide standards of employee conduct and criteria for the conferral or denial of certain benefits. Accordingly, the definition of "gross misconduct" in the employment security statutes is persuasive authority for an appropriate construction of K.S.A. 75-2949f(a).

We also find it persuasive that the legislature's definition of "gross" misconduct within the employment security statutes comports with the accepted meaning of the term "gross" when employed in negligence cases. Our courts have specifically held that "gross and wanton negligence" as it appeared in G.S. 1949, 8-122b was something more than ordinary negligence. See, *e.g., Swinney v. Ward*, 187 Kan. 746, Syl. ¶ 1, 360 P.2d 193 (1961). Although the former "guest statute" may have had different purposes than the CSA, decisions construing one may be material, or at least persuasive, in determining rights and liabilities under the other. See *Shapiro*, 211 Kan. at 456-57. These decisions, together with the definition provisions of the employment security statutes, con-

vince us that the legislature intended "gross" misconduct and conduct "grossly" unbecoming to a state employee to mean something significantly more than ordinary misconduct and to require something akin to wanton misconduct.

Another approach to be considered in statutory construction is the doctrine of *noscitur a sociis*, literally "it is known from its associates." In essence, when the meaning of a word or phrase is doubtful, it may be clarified or ascertained by reference to those words or phrases with which it is associated. *State v. Zabrinas*, 271 Kan. 422, 432, 24 P.3d 77 (2001). Applying this doctrine, the language in issue may be compared to the other grounds for discipline listed in K.S.A. 75-2949f: "conviction of a criminal act"; "immoral conduct"; "willful abuse or misappropriation" of state property; making a material false statement in an application for employment; participating in any act that would in any way seriously disturb the normal operation of the agency; trespassing on any state employee's property for the purpose of harassing or forcing discussion with the occupants; willful damage to state property; willfully endangering the lives or property of others; "possession of unauthorized firearms or other lethal weapons while on the job"; "performing duties in a brutal manner, or mistreating, neglecting or abusing" any person in the employee's care; insubordination; being under the influence of alcohol or drugs while on the job; "knowingly releasing confidential information from official records"; use of the employee's position or time on the job or use of state property in connection with a political campaign; "exhibiting other personal conduct detrimental to state service which could cause undue disruption of work or endanger the safety of persons or property of others"; "gross carelessness or gross negligence"; "grossly improper use of state property"; and "sexual harassment" in connection with employment. We conclude from examining these associated statutory bases of dismissal that the legislature generally intended the per se grounds for dismissal to require misconduct of a very serious or extreme nature and generally to require pernicious if not malicious intent.

On its face, Jones' conduct in this incident is not nearly as egregious as that found in most cases in other states where a police

officer is found to have committed misconduct warranting dismissal. See, *e.g.*, *McCloud v. Rodriguez*, 304 Ill. App. 2d 652, 710 N.E.2d 37 (1999) (disobeying an order to terminate a chase, failing to report shots were fired, and unnecessarily displaying a weapon constituted gross misconduct); *Nation v. Bd. of Fire & Police Comm'rs*, 40 Ill. App. 3d 384, 352 N.E.2d 464 (1976) (officer failed to uphold high standards of his office by intentionally and repeatedly entering private locker of another officer; dismissal upheld); *Bowns v. Port Huron*, 146 Mich. App. 69, 75-77, 379 N.W.2d 469 (1985) (officer's involvement in gambling activities off-duty was misconduct); *City of Minneapolis v. Moe*, 450 N.W.2d 367, 370 (Minn. App. 1990) (felonious possession of cocaine was "misconduct striking at the very essence of law enforcement"); *State Troopers Ass'n v. State Police*, 667 A.2d 38, 41 (Pa. Commw. 1995) (completing false reports to retaliate against another officer and findings by judge questioning officer's credibility warranted discipline). Although these cases are merely instructive, they demonstrate that other states generally require far more than ordinary misconduct for dismissal of police officers.

We conclude that, for purposes of K.S.A. 75-2949f(a), ordinary misconduct is to be distinguished from gross misconduct, and conduct unbecoming an officer is to be distinguished from conduct "grossly" unbecoming an officer. Particularly since the legislature concluded that the addition of "grossly" was worthy of a specific amendment in 1985, we must conclude that insertion of such terms in qualifying the conduct justifying dismissal was not meaningless and should not be disregarded. See *Todd v. Kelly*, 251 Kan. 512, 515, 837 P.2d 381 (1992). Although we decline to establish a general rule that would serve to define "gross misconduct" in every case, we believe that the legislature intended that "gross" and "grossly" in the language of K.S.A. 75-2949f(a) mean something significantly more than ordinary misconduct. Notwithstanding our refusal to provide a missing statutory definition for all purposes, we are convinced that in order for misconduct to be "gross," it must be aggravated, extreme, or wanton in nature, evincing a knowing and reckless disregard for the rules, policies, or other standards of appropriate behavior.

We respectfully disagree with the district court that "the principal issue [in this appeal] is one of trust"; we find no standard or criteria of "trust" within the operative statute, and we decline to create a special criteria or test for state-employed police officers. The principal issue in this appeal requires determination of legislative intent in requiring "gross" misconduct or conduct "grossly" unbecoming a state employee as grounds for dismissal. KSU argues and we agree that a police officer should be held to a high standard of conduct and that an officer's integrity is a mainstay of our judicial system, but the legislature has provided no special criteria for the dismissal of such employees. Where the legislature has created no special statutory classification or special statutory criteria for dismissal of a class of employees, it is beyond this court's prerogative to do so. See *Eveleigh v. Conness*, 261 Kan. 970, 978, 933 P.2d 675 (1997). We believe that the statute should be uniformly construed and applied, regardless of the position held by the subject employee.

Particularly since Jones' actions in erroneously stating facts in his incident report were not intentional and may have been mere negligence, and since Jones' violation of the in-car camera policy was somewhat technical and dependent upon a disputed construction of the policy, we hold that the Board and the district court erred in concluding that these actions were "gross misconduct" or "conduct grossly unbecoming a state employee." These actions may have constituted "misconduct," but we conclude that they were not "gross misconduct" or conduct "grossly" unbecoming a state employee. Applying our statutory construction to the facts of this case, the Board and district court must be reversed and Jones must be reinstated, with appropriate back pay and associated benefits.

Reversed and remanded with instructions to reinstate Jones, with back pay and benefits.

MALONE, J., dissenting: I respectfully dissent. I have no difficulty concluding that Officer Gary F. Jones' actions constituted gross misconduct sufficient to support his termination as a police officer.

After stopping Gretchen Esping, Jones determined from the dispatcher that Esping was driving on a suspended license. This is a serious offense. It does not matter that the citation was ultimately dismissed. At the time, Jones believed he was dealing with someone illegally driving an automobile.

Jones committed two serious violations of police department policy. First, he intentionally turned off the video camera before the police stop was terminated. He also failed to log the recording on the log sheet in an attempt to prevent it from being located. The majority refers to this as a "technical violation" of police department policy.

The purpose of the recording system is to ensure reliable documentation of police stops, benefitting both the police and the public. In this case, a few days after the stop, Esping filed a complaint about Jones' conduct during and after the traffic stop. Esping complained that Jones threatened and harassed her about whether she could continue to drive. By turning off the recording device, Jones destroyed evidence and unnecessarily exposed the department to charges of police misconduct.

Jones admitted that he violated the policy in order to hide the fact he was going to allow Esping to drive in further violation of the law. I do not consider this to be a "caring gesture." Imagine the liability of Kansas State University (KSU) if Esping had injured someone with her vehicle after Jones "looked the other way" and allowed her to drive.

Next, Jones filed a false police report. The report was false because it indicated that Esping's vehicle was legally parked when in fact it was illegally parked. This was not "a meaningless . . . detail." Jones placed this information into his report to explain why he left the vehicle at the scene without assuring it was properly moved. Considering the rest of Jones' actions, it is hard to believe this was an unintentional misstatement of fact.

More importantly, the report was false because of what it *failed* to mention. The report failed to state that Jones turned off the security camera and told Esping that she could drive home. The report left the impression that Esping would have a friend drive

the vehicle to her apartment when in fact Esping later admitted that she drove home.

Filing a false report is a particularly serious offense for a police officer. As witnesses testified before the KSU.Classified Employee Peer Review Committee, prosecutors regularly inquire if there are any credibility or integrity problems with an officer because prosecutors do not want to discover these matters from defense attorneys during a trial. Evidence was presented that Jones' credibility as a police officer had been compromised to the extent it affected his performance of duties. After this incident, the Manhattan city attorney's office informed Jones' superior that Jones' credibility was an issue in that court. In his testimony before the Civil Service Board, Jones admitted that the Riley County Police Department informed KSU police that, because of Jones' credibility problems, he was not permitted to go off campus to assist with an arrest.

The district court found that Jones was terminated because of a question of trust. The court was correct to focus on this reason. The district court's finding was certainly supported by substantial evidence, and its legal conclusion was sound.

In this case, Jones committed "misconduct striking at the very essence of law enforcement." I agree with the Director of the KSU Police Department, the KSU Director of Human Resources, the unanimous Peer Review Committee, the unanimous Civil Service Board, and the district court in finding that Jones' actions constituted gross misconduct sufficient to support his termination as a police officer.