No. 90,475

Gary F. Jones, *Appellant,* v. Kansas State University, *Appellee.*

106 P.3d 10

Opinion filed February 18, 2005.

*Luke B. Harkins*, of Steve A. J. Bukaty, Chartered, of Overland Park, argued the cause, and *Steve A. J. Bukaty*, of the same firm, was with him on the briefs for appellant.

*Richard H. Seaton*, of Office of University Attorney, Kansas State University, of Manhattan, argued the cause, and was on the briefs for appellee.

The opinion of the court was delivered by

DAVIS, J.: Gary Jones was terminated from his position as a police officer with the Kansas State University Police Department (KSU Police) for gross misconduct or conduct grossly unbecoming a state officer or employee pursuant to K.S.A. 75-2949f(a). In subsequent appeals, the Kansas Civil Service Board (Board) and the district court upheld the termination. The Court of Appeals reversed and remanded with instructions to reinstate Jones with back pay and benefits in *Jones v. Kansas State University*, 32 Kan. App. 2d 322, 325-26, 81 P.3d 1243 (2004). This court granted the Kansas State University's (KSU) petition for review and has jurisdiction pursuant to K.S.A. 60-2101(b).

Gary F. Jones was employed as a police officer with the KSU Police beginning in January 1997. On August 26, 2001, Jones was riding with Student Security Officer Pharaoh Guice when he stopped a vehicle driven by Gretchen Esping for speeding.

Most of the traffic stop was recorded by a video camera in Jones' police car. The videotape reflects that Esping pulled over approximately 6 feet from the curb, parallel to the curb but perpendicular to the marked parking spaces. Jones approached the vehicle, asked to see her driver's license, and advised her that she was going at least 32 miles per hour in a 20 miles per hour zone. Jones ran a license check, which revealed that Esping's license had been sus-

pended in March 2001. Jones relayed this information to Esping, who denied knowledge of the suspension. Jones told her that by law he had to write her a citation and could not let her drive the car but she could have someone drive the car home for her. When Jones told her that he had to make a criminal report, Esping became upset and started crying.

Jones returned to his car to verify the suspension. At this point, Jones asked Guice to make sure that the stop was being videotaped because "this lady is gonna be a problem." Jones then went back and advised Esping that the dispatcher had confirmed the suspension for the third time and asked Esping for her address. Esping, who was still crying, gave Jones her address and said that she lived at the end of the block. Esping told Jones that she wanted to know what court had suspended her license. Jones returned to his car to write out the traffic citation and to get that information for her. Upon returning to his car, Jones again told Guice, "I'm gonna let this run and run. I do not want that turned off for any reason. Any reason."

Jones returned to Esping's vehicle, asked Esping to sign the citation, and advised her of the court date. Esping told Jones that he would have to appear in court with her lawyer, and Jones asked if she was threatening him. Esping initially refused to sign the citation and tried to explain to Jones that she was never informed that her license had been suspended and that it was not suspended. Jones informed her that if she did not sign the citation he would have to put her in handcuffs and take her to jail. Esping then asked Jones to drive her car home. Jones told her that he could not do that but that he would give her a ride home or she could walk home and he would make sure that her car did not get towed. After Jones repeatedly told Esping that signing the citation was not an admission of guilt, Esping finally signed and accepted the ticket.

Esping started crying again and asked Jones if he could follow her home, and he refused. After explaining the ticket to her, Jones asked again if he could give her a ride home. She asked again if she could just take her car down to the corner to get her groceries to her home. Jones responded, "Okay. One second. One second. I want to tell you something. One second." He walked back to the

police car and said, "Kill the lights, kill all my lights." This deactivated the camera, and nothing more of the stop was recorded. Later that night, Jones completed a report of the incident which provided in relevant part:

"At this time I informed the suspect that her license was suspended, and that I would issue her a notice to appear (citation # 6638) and she would be released at the scene, the suspect vehicle was legally parked at the time of the stop so the driver agreed to leave the vehicle where it was until she could have a friend drive her vehicle to her apartment building."

Approximately a month later, Esping filed a complaint claiming that Jones threatened her or conducted himself in a manner that caused her to have concern for her safety. The KSU Police began an internal investigation of the traffic stop. Captain Charles Beckom conducted the investigation and reviewed the videotape, the tape log, the in-car camera policy, and interviewed various witnesses, including two neighbors of Esping, Ahmed Elshahawi and Samir El-Zarkouny, and Esping, Guice, and Jones.

Esping told Captain Beckom that after ordering Guice to turn off the video camera, Jones said, "My wife is German and you and I are about the same age. . . . Tell you what. You give us two minutes to get out of here and then you go park your car in front of your apartment and don't drive it again until this is cleared up." Guice verified that Jones told him to turn off the camera, spoke with Esping for about 10 seconds, and said something "to the effect of her doing what she wanted to do after he left the area."

Jones told the investigator that he turned off the videotape for about 2 minutes because he did not want anyone to hear him telling Esping that "he was not going to watch her when they left" and so that the KSU Police would not use it against him for being a caring person. Jones also admitted that he went to Esping's apartment later that day to tell her about the teletype reflecting the suspension of her driver's license. He also went to her apartment about a month later to ask for a statement after he learned he was being investigated for the incident.

On December 13, 2001, KSU Police Director Ronnie Grice sent a letter to KSU Director of Human Resources Gary Leitnaker requesting that Jones be terminated immediately because Jones

knowingly submitted false information in his police report and also violated the in-car camera policy by turning off the camera before the traffic stop was terminated to intentionally prevent any recording of the conversation at the end of the stop. However, the investigation had concluded that insufficient evidence was presented to support Esping's claim that Jones threatened her or conducted himself in a manner that caused her to have concern for her safety.

On December 14, 2001, Leitnaker sent Jones a letter informing him that the KSU Police requested his dismissal for the reason of gross misconduct or conduct grossly unbecoming a state officer or employee in violation of K.S.A. 75-2949f(a). Jones was advised that he could submit any information to Leitnaker on his behalf. After Leitnaker and Jones met on December 19, 2001, Leitnaker continued to recommend dismissal and informed Jones of his right to appeal to the KSU Classified Employee Peer Review Committee (PRC). The PRC, consisting of five classified employees from across the KSU campus, then conducted a hearing regarding Leitnaker's recommendation.

After the January 8, 2002 hearing, the PRC unanimously concurred with the KSU Police findings and recommendation for dismissal in concluding that Jones did submit false information in a case report regarding this traffic stop and violated the in-car camera policy that states "every traffic stop shall be recorded until the stop is terminated." Leitnaker dismissed Jones effective January 10, 2002, for reason of gross misconduct or conduct grossly unbecoming a state officer or employee and informed him of his right to appeal to the Board.

Jones filed a timely request for a hearing before the Board pursuant to K.S.A. 2003 Supp. 75-2949(f), and a hearing was held on May 21, 2002. Leitnaker, Grice, Beckom, and Guice testified on behalf of KSU Police. Leitnaker described his review of the recommendation to terminate Jones and the PRC process. On cross-examination, Leitnaker acknowledged that Jones had an Equal Employment Opportunity Commission (EEOC) charge pending at the time of his termination. Additionally, he testified that the KSU Police had attempted to terminate Jones in the past for falsifying his employment application, but the PRC had recom-

mended that he be given a second opportunity and be placed on probation for 1 year.

KSU Police Director Grice testified that the KSU Police had received a request from the municipal prosecutor regarding the traffic stop that was made on August 26, 2001, by Jones. It took the officer in charge of that unit about a month to find the videotape of the stop because it had not been logged in and was on an 8-hour tape. Grice testified that the videotape and Jones' report of the incident did not match; therefore an internal investigation was conducted which concluded that Jones had violated the KSU Police policy by turning off the camera and by falsifying his police report.

Grice explained that he requested termination in this case because Jones created an integrity issue by covering up something that he did wrong. As an officer with the KSU Police with a credibility or integrity issue, any report, citation, or documentation produced by Jones might be thoroughly questioned by the prosecutor in any case that he would submit paperwork.

Captain Beckom opined that the traffic stop was not terminated when the camera was turned off. Beckom testified that the car was not legally parked because it was parked parallel to the roadway across three parking spaces, and parking in that area is at 90 degrees to the curb. Beckom felt that termination was justified because he had a serious concern about Jones' credibility. He reasoned that the last paragraph of the report was totally false as the car was not legally parked and the driver did not agree to let a friend drive the car. He explained that at most times this information would not be included in the report, and it was an intentional false statement to cover up something.

Guice testified that he did not consider the stop terminated when Jones told him to turn off the camera and Jones returned to Esping's vehicle. Upon his return, Jones said that he told Esping she could do what she wanted after they left because she had groceries in the car. Later that night, Guice went back by the location and observed that Esping's vehicle was legally parked near what he believed was her residence.

Jones testified that he had 17 years of law enforcement experience before beginning employment with the KSU Police in 1997.

He said that he was targeted for termination at least 10 times while with KSU Police. Jones indicated that he had filed an earlier EEOC discrimination lawsuit against KSU Police which was settled with the agreement that the KSU Police would officially put in writing that he was a good police officer in good standing. He filed his second EEOC charge 8-9 months before the incident in this case, which dealt primarily with Lieutenant Richard Herman who acted as the spokesperson for the KSU Police at the PRC hearing.

Jones explained that he did not violate the in-car camera policy because the traffic stop was terminated when he gave her the ticket. He explained that he told Captain Beckom that he had instructed Guice to turn off the camera because the traffic stop was terminated and that he was afraid that the next thing he was going to say to her, "I didn't care," referring to whether she moved the car, was going to be used against him.

Jones testified that he typed the report later that evening from memory. He did not intentionally state that the car was legally parked knowing it was illegally parked, but he was more concerned with what was going on with her and "how this would [a]ffect her and me." Jones said that after the video camera was turned off he told Esping that he understood her plight but he could not legally let her drive in his presence. Esping agreed to let someone else take the car, but Jones concluded the conversation by saying he did not care what she did.

Jones admitted on cross-examination that the two most recent directors of the Riley County Police Department directed the KSU Police not to permit Jones to go off campus to assist with the Riley County Department. Prior to this testimony, the Board members had extensively questioned Jones about the nature of his EEOC complaints and his previous performance evaluations.

KSU Police Officer Timothy Schrog testified on Jones' behalf and opined that a traffic stop is terminated when the violator signs the traffic ticket and has signed on the line that he or she will contact the court. At that point, the violator is free to leave, even if the officer told the motorist to wait a minute, because the officer no longer had a custodial stop.

At the conclusion of the hearing, the Board unanimously voted to uphold the termination in concluding that Jones' actions constituted misconduct or conduct grossly unbecoming a state officer or employee pursuant to K.S.A. 75-2949f(a). The Board reasoned that "the appointing authority considered the totality of circumstances in this matter and that his decision was reasonable and based on the best interests of the agency and the State of Kansas."

Jones petitioned for judicial review, and the district court heard oral arguments on the case. Jones argued it was not gross misconduct to turn off the video camera regardless of whether the stop had been terminated because the KSU Police did not have any method in place for monitoring and enforcing that policy. Jones alleged that his report's statement that Esping agreed to have a friend drive the car was not false because she told him that after the videotape was turned off. Jones also argued that it was highly debatable whether the car was legally parked and even if it was not, it was such a "meaningless detail" that it had nothing to do with the element of driving on a suspended license.

Jones further asserted that the KSU Police was seeking to terminate him because of his previous lawsuit and his pending EEOC charge and the Board improperly focused on the merits of these actions. Jones argued that no separate standard for gross misconduct for law enforcement officers exists under the statutes and KSU has essentially said that any smudge to the integrity of an officer renders that officer useless to the KSU Police.

In affirming the Board, the district court noted that the Board did not expressly find a violation of the in-car camera recording policy. However, the court concluded this finding was unnecessary to find evidence of gross misconduct or conduct grossly unbecoming a state officer and employee. The court reasoned that Jones' actions and the issue of trust, and not a policy violation, were the principal issues. The court found that Jones intentionally shut off the recording and

"[w]hether, objectively, what was done 'off camera' was something great or small, the significant point is that [Jones] did not want his actions to be recorded and, while he earlier wanted to ensure that the tape was getting everything, to protect

his interest in a somewhat difficult stop, he later acted to make sure the tape was stopped, also to protect his interest."

The court also found that the record supported the Board's finding that Jones included false information in his report relating to whether Esping's car was legally parked. The court concluded that the Board applied the correct standard of review in determining that Jones' termination was reasonable and that substantial evidence supported the Board's determination.

Jones timely appealed, but his appeal was initially dismissed for failing to timely docket the appeal pursuant to Supreme Court Rule 5.051 (2003 Kan. Ct. R. Annot. 32). Jones' motion to reinstate the appeal was granted.

A majority of the panel of the Court of Appeals reversed the district court. 32 Kan App. 2d at 314, 326. The majority first found that substantial competent evidence existed in the record to support the accusation that Jones erroneously characterized the vehicle as legally parked, but no evidence was presented that the error was intentional or that the inaccuracy should be characterized as a falsification. The majority also found that substantial evidence was presented that Jones technically violated the in-car camera policy in stopping the camera prior to the end of the "Esping 'event.' " 32 Kan. App. 2d at 319-21.

In determining whether Jones' actions constituted gross misconduct or conduct grossly unbecoming an officer under K.S.A. 75-2949f, the Court of Appeals majority first examined the legislative history of the Civil Service Act (CSA), K.S.A. 75-2925 *et seq.*, including K.S.A. 75-2949f. As the legislature never defined these terms within the CSA, the majority compared the language in K.S.A. 75-2949f(a) to the language used in describing other grounds for discipline under our statutes and reviewed cases from other jurisdictions where an officer's misconduct warranted dismissal. It ultimately adopted the definition of gross misconduct from the employment security statutes, K.S.A. 2002 Supp. 44-706(b)(1) (now K.S.A. 2003 Supp. 44-706[d][1]). 32 Kan. App. 2d at 323-25.

The Court of Appeals majority disagreed that the principal issue was one of trust and declined to create a special criteria or test for

state-employed officers, reasoning that the statute should be uniformly construed and applied. The majority concluded that the Board and the district court erred in concluding that Jones' actions were gross misconduct or conduct grossly unbecoming a state employee, "[p]articularly since Jones' actions in erroneously stating facts in his incident report were not intentional and may have been mere negligence, and since Jones' violation of the in-car camera policy was somewhat technical and dependent upon a disputed construction of the policy." 32 Kan. App. 2d at 326.

Judge Malone wrote a dissenting opinion concluding that Jones' actions constituted gross misconduct sufficient to support his termination as a police officer. The dissent found that Jones committed two serious violations of police department policy by intentionally turning off the video camera before the stop was terminated and by failing to log the videotape recording on the log-in sheet in an attempt to prevent it from being located. It noted that the purpose of the recording system is to ensure reliable documentation of police stops and Esping had filed a complaint about Jones' conduct during the stop in this case. By turning off the camera, Jones destroyed evidence and unnecessarily exposed the KSU Police to charges of police misconduct. 32 Kan. App. 2d at 327.

The dissent further found that Jones filed a false report by stating that the vehicle was legally parked, and upon consideration of Jones' actions, "it is hard to believe this was an unintentional misstatement of fact." 32 Kan. App. 2d at 327. The report was also false because it failed to state that Jones turned off the camera and told Esping that she could drive home. It found that filing a false report is a particularly serious offense for a police officer because prosecutors regularly inquire if there are any credibility or integrity problems with officers that will arise at trial. The dissent agreed with the district court's assessment that Jones was terminated because of a question of trust and concluded that Jones committed "misconduct striking at the very essence of law enforcement" which constituted gross misconduct sufficient to support his termination as a police officer. 32 Kan. App. 2d at 328.

KSU petitions for review arguing "substantial competent evidence supports the decision of the Board and the Court of Appeals incorrectly interpreted the phrase 'gross misconduct or conduct grossly unbecoming a state officer or employee' " under K.S.A. 75-2949f(a).

Standard of Review

K.S.A. 2003 Supp. 75-2949(a) provides that an appointing authority may dismiss any permanent employee in the classified service when it considers that the good of the service will be served thereby. When a permanent employee is finally dismissed by the appointing authority, the employee may request a hearing from the Board to determine whether the appointing authority acted reasonably in taking such action under K.S.A. 2003 Supp. 75-2949(f).

The Kansas Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.*, is applicable to appeals from orders of the Board. K.S.A. 75-2929h. K.S.A. 77-621(c) sets forth the following applicable scope of review:

"(4) the agency has erroneously interpreted or applied the law;

. . . .

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious."

The party asserting the agency's action is invalid bears the burden of proving the invalidity. K.S.A. 77-621(a)(1).

Parties that appeal an agency action to the district court pursuant to the KJRA may appeal the district court decision to the appellate courts, just as parties do in other civil cases. K.S.A. 77-623. When reviewing the district court's decision reviewing an agency action, the appellate court must first determine if the district court observed the requirements and restrictions placed upon it. It then makes the same review of the administrative agency's action as did the district court. *Connelly v. Kansas Highway Patrol*, 271 Kan. 944, 964, 26 P.3d 1246 (2001), *cert. denied* 534 U.S. 1081 (2002).

In reviewing an agency action, the appellate court is limited to ascertaining from the record *if substantial competent evidence supports the agency findings.* Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issue can reasonably be resolved. *Winston v. Kansas Dept. of SRS*, 274 Kan. 396, 404, 49 P.3d 1274, *cert. denied* 537 U.S. 1088 (2002).

The appellate court must accept as true the evidence and all inferences to be drawn therefrom which support or tend to support the findings of the factfinder and must disregard any conflicting evidence or other inferences. A rebuttable presumption of validity attaches to all actions of an administrative agency, and the burden of proving arbitrary and capricious conduct lies with the party challenging the agency's actions. *Connelly*, 271 Kan. at 965.

However, when a party disputes the district court's interpretation of a statute, the issue raised is a question of law, and the appellate court's scope of review is unlimited. *Kansas Dept. of Transportation v. Humphreys*, 266 Kan. 179, 182, 967 P.2d 759 (1998).

Evidence Supporting the Board's Decision

KSU argues that substantial competent evidence supports the Board's findings that Jones' actions constituted gross misconduct or conduct grossly unbecoming a state officer or employee under K.S.A. 79-2949f. It contends that the Court of Appeals majority reweighed the facts and substituted its own judgment for that of the Board, the PRC, and the appointing authority. Jones counters that the Court of Appeals majority correctly focused on the lack of evidence of intentional falsification. He contends that KSU is trying to rewrite the Board's findings of fact in an attempt to include disputed facts not decided in its favor.

The PRC unanimously concurred with the KSU Police findings and recommendation for dismissal on the grounds that Jones violated KSU Police policy by submitting false information in a case report regarding this traffic stop and violating the in-car camera policy that states "every traffic stop shall be recorded until the stop is terminated."

Without explicitly finding that Jones violated these policies, the Board concluded that Jones' actions that day constituted gross misconduct or conduct grossly unbecoming a state officer or employee. This finding of gross misconduct, coupled with the specific factual findings discussed below, strongly suggests that the Board found that Jones violated both policies. As such, our analysis will focus first on whether substantial competent evidence supports these factual findings.

a. Submission of False Information in Police Report

KSU Police Policy and Procedure § 12.3.24 provides: "An officer shall not make or submit any false or inaccurate reports or knowingly enter or cause to be entered into any departmental books, records or reports, any inaccurate, false or improper information."

Relevant to this issue, the Board made the following relevant factual findings:

"8. Mr. Jones then returned to Ms. Esping's car and informed her that he didn't care what she did with her car once he left. He then returned to the patrol car and departed the area with Ms. Esping remaining.

. . . .

"11. Mr. Jones stated in his report that Ms. Esping's vehicle was legally parked at the time of the stop and that the driver had agreed to leave the vehicle where it was until a friend could return the vehicle to her apartment building. Ms. Esping's vehicle was not legally parked at the time of the traffic stop.

"12. The Manhattan city prosecutor requested from the KSU Police Department, a copy of the video and audiotape of the traffic stop of Ms. Esping. In complying with this request, the KSU Police Department discovered that Mr. Jones had turned off the in-car camera prior to the completion of the traffic stop and that his report differed from the information on the tape regarding whether Ms. Esping's vehicle was legally parked at the time of the traffic stop."

The videotape of the stop clearly shows that the car was illegally parked 6 feet from the curb and perpendicular to marked parking spaces, but the written report indicates that it was legally parked. We conclude that substantial competent evidence supports the Board's finding that Esping's vehicle was illegally parked at the time of the traffic stop and that Jones indicated that it was legally parked in his report.

The Board did not explicitly find that Jones *intentionally* falsified his report or that he violated this policy. Where an administrative agency's findings of fact and conclusions of law are inadequate to disclose the controlling facts or the basis of the agency's findings, meaningful appellate review is precluded. *Citizens' Utility Ratepayer Bd. v. Kansas Corporation Comm'n*, 28 Kan. App. 2d 313, 317, 16 P.3d 319 (2000), *rev. denied* 271 Kan. 1035 (2001). The appropriate remedy for inadequate findings in a final order of an administrative agency is to remand for additional findings of fact and conclusions of law. *Gas Service Co. v. Kansas Corporation Commission*, 4 Kan. App. 2d 623, 626, 609 P.2d 1157, *rev. denied* 228 Kan. 806 (1980).

However, we find it reasonable to conclude that the Board believed the policy was violated and the misstatement in the report was intentional in concluding that Jones committed gross misconduct and conduct grossly unbecoming a state officer and employee and by finding that the appointing authority's decision, which found the policy was violated, was reasonable. As such, remand is unnecessary for resolution of this issue.

The Court of Appeals majority concluded that no evidence was presented that Jones *intentionally* falsified the report so as to warrant a finding of gross misconduct. However, intent may be shown by circumstantial evidence and does not need to be directly proven. *State v. Whitesell*, 270 Kan. 259, 275, 13 P.3d 887 (2000). In this case, circumstantial evidence was presented to support the conclusion that Jones intentionally indicated that the vehicle was legally parked.

First, the videotape clearly shows that Esping's car was parked approximately 6 feet from the curb, perpendicular to marked parking spaces. Second, Jones acknowledges the car was illegally parked in the video by offering to put his card on the car so that it would not be towed. Third, Jones gave inconsistent explanations for the inaccuracy in his report, saying it was legally parked because it was a Saturday, he was not thinking about it when he wrote the report, or the status of the car was "meaningless detail." Fourth, Jones failed to log in the stop in the videotape recording log, which made locating the videotaped stop more difficult. Fifth, Captain Beckom

testified that at most times this information, *i.e.*, that the car was legally parked and she agreed to leave it until friends would pick it up, would not be included in the report and thus opined that it was an intentional false statement to cover up something. Finally, Jones admitted that he turned off the video camera to hide the fact that he was going to tell Esping that she could do whatever she wanted after he left. Based on these actions, we agree with Judge Malone's dissenting conclusion that "it is hard to believe this was an unintentional misstatement of fact."

Both the Court of Appeals and this court are charged only with determining if the Board applied the correct standard of review and if its conclusion that the appointing authority's actions were reasonable and supported by substantial competent evidence. As the circumstantial evidence described above supported a finding that Jones intentionally falsified the report, the Court of Appeals majority mistakenly disregarded its limited standard of review in this case by reweighing the evidence and substituting its own judgment for that of the Board. Although Jones attempts to argue that this court may not look outside the findings of fact made by the Board, this court must review the evidence presented before the Board to determine whether its findings were supported by substantial competent evidence. Contrary to the Court of Appeals majority, substantial competent evidence supports the finding that Jones intentionally falsified the police report.

### b. In-Car Camera Policy

The KSU Police policy regarding in-car camera recording systems, General Order 62.1.18, § B, Operating Procedures, provides in relevant part:

"5. Officers shall record all traffic stops and pursuits, along with major accidents, where practical. . . . No officer may terminate recording an event of this type, until the event has been concluded.

"6. Every traffic stop shall be recorded until the stop is terminated.

"7. Incidents that generate reports will be recorded on the MVR tape log sheet."

Although the Board did not specifically find that the policy was violated, it did note in its factual findings that "the KSU Police

Department discovered that Mr. Jones had turned off the in-car camera prior to the completion of the traffic stop."

Jones does not dispute that he told Esping to wait, that he ordered the video camera to be turned off, and that he returned to her car and told Esping he did not care what she did after he left. Captain Beckom and Pharaoh Guice both testified that the traffic stop was not concluded when Jones ordered the camera to be turned off. Although Jones presented testimony that the stop was concluded, it is not the function of this court to reweigh this evidence. See *In re Tax Appeal of ANR Pipeline Co.*, 276 Kan. 702, 723, 79 P.3d 751 (2003).

The Court of Appeals majority begrudgingly admits that the opinion testimony of the KSU witnesses provided substantial competent evidence that Jones "technically" violated the policy. 32 Kan. App. 2d at 320-21. It appears that the majority attempts to downplay this violation as a technicality in an attempt to support its ultimate conclusion that Jones' conduct was not "gross." The majority seemingly overlooks the fact that Jones admitted that he turned off the camera in order to protect himself from the consequences of what he was planning on telling Esping. Regardless of its characterization, we find substantial competent evidence was presented that Jones violated the policy by ordering the in-car camera to be turned off prior to the termination of the traffic stop.

As substantial competent evidence supports the two grounds for termination, our next relevant inquiry is whether these actions constituted gross misconduct or conduct grossly unbecoming a state officer or employee under K.S.A. 75-2949f(a).

Interpretation of K.S.A. 75-2949f(a)

KSU argues that the Court of Appeals misapplied K.S.A. 75-2949f(a) by interpreting the terms "gross misconduct" and "conduct grossly unbecoming a state officer" and thereby making a single standard applicable to all cases. It contends that this approach usurps the role delegated to the Board by the legislature to determine the reasonableness of the employer's decision on a case-by-case basis. Jones argues the definition provided by the Court of

Appeals majority is entirely reasonable and urges this court to adopt the Court of Appeals' reasoning on this issue in its entirety.

As the legislature has not expressly defined these terms, this issue involves the interpretation of a statute that is a question of law over which appellate courts exercise unlimited review. *Cooper v. Werholtz*, 277 Kan. 250, 252, 83 P.3d 1212 (2004).

The fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. In determining legislative intent, courts are not limited to consideration of the language used in the statute but may look to the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute might have under the various constructions suggested. In construing statutes, the legislative intent is to be determined from a general consideration of the entire act. *Board of Lincoln County Comm'rs v. Nielander*, 275 Kan. 257, 265, 62 P.3d 247 (2003).

a. Legislative History of K.S.A. 75-2949f

The Civil Service Act (CSA), K.S.A. 75-2925 *et seq.*, was originally enacted in 1941, and its general purpose is to "establish a system of personnel administration that meets the social, economic and program needs of the people of the state of Kansas as these needs now or in the future may be established." K.S.A. 75-2925. This system was intended to allow the State to "recruit, select, develop and maintain an effective and responsible work force . . . ." K.S.A. 75-2925. It was designed so that all employment decisions "shall be made without regard to race, national origin or ancestry, religion, political affiliation, or other nonmerit factors" but would "be based on merit principles and fitness to perform the work required and shall provide fair and equal opportunity for public service." K.S.A. 75-2925

K.S.A. 75-2949d provides that permanent classified employees may be dismissed because of deficiencies in work performance as set forth in K.S.A. 75-2949e or because of "personal conduct detrimental to the state service" as set forth in K.S.A. 75-2949f. K.S.A. 75-2949f sets forth a nonexclusive list of the "[g]rounds for dismissal, demotion or suspension of a permanent employee for per-

sonal conduct detrimental to the state service." In this case, Jones was terminated for violating K.S.A. 75-2949f(a): "Gross misconduct or conduct grossly unbecoming a state officer or employee."

K.S.A. 75-2949f was not part of the original CSA. Prior to 1978, K.S.A. 75-2949 provided that the appointing authority was authorized to dismiss a permanent classified employee after consideration "that the good of the service will be served thereby, and for disciplinary purposes may suspend . . . but no permanent employee in the classified service shall be dismissed for political, religious or racial reasons." K.S.A. 75-2949 (Weeks 1977).

In 1978, the legislature enacted K.S.A. 75-2949b, dealing with procedures prior to demotion or suspension, suspension without notice and grounds for disciplinary action, and subsection (c) provided 16 situations in which disciplinary action could be undertaken, including when an employee: "(1) Was found guilty of gross misconduct or conduct unbecoming a state officer or employee." L. 1978, ch. 332, sec. 19.

The legislature repealed this statute in 1981 and enacted K.S.A. 75-2949f. Senate Bills 416 and 417 were proposed to amend the CSA as it pertained to disciplinary actions before the Board. See L. 1981, chs. 334 and 335. The February 23, 1981, Senate Committee on Federal and State Affairs Minutes indicate that Art Griggs of the Department of Administration presented a request for amendments to the CSA relating to disciplinary actions and appeals to the Board, which again included the "[g]ross misconduct or conduct unbecoming a state officer or employee" language at issue in this case under K.S.A. 75-2949f(a).

In a February 16, 1981, Memorandum to the Federal and State Affairs Committee, Norman Hanson, Director of Personnel Services of the Department of Administration, explained the reasoning for the proposed amendments in relevant part:

"The sections of the Civil Service Act pertaining to dismissals, suspensions, and demotions of permanent state employees, and appeals to the State Civil Service Board, were extensively revised in 1973.

"State administrators and state employees have had difficulty understanding these sections of the Civil Service Act.

"We are proposing amendment of these sections this year, with the principal objective of clarifying the language and, thus, making it easier for state agencies and state employees to know their rights and responsibilities." Minutes, Sen. Comm. on Fed. and State Affairs, February 23, 1981.

At the March 24, 1981, Senate Committee on Federal and State Affairs Hearing, Griggs went over S.B. 417 section by section. Section 5 related to the statute at issue in this case, and the typed notes next to a copy of this section state: "New Sec. 5 replaces K.S.A. 1980 Supp. 75-2949b. These are the same 16 examples listed in present law of reasons for disciplinary action for personal conduct detrimental to the state service. Some of the examples are reworded." Minutes, Sen. Comm. on Fed. and State Affairs, March 24, 1981; see L. 1981, ch. 334, sec. 5. Nothing in the legislative history explains why the examples were reworded.

In 1985, the legislature amended K.S.A. 75-2949f(a) to state: "Gross misconduct or conduct *grossly* unbecoming a state officer or employee." L. 1985, ch. 276, sec. 7(a). The 1985 legislature also added what are now subsections (q) and (r), which allow disciplinary actions for "gross carelessness or gross negligence" or "grossly improper use of state property." L. 1985, ch. 276, sec. 7(q), (r).

Once again, the legislative history provides little guidance as to why the term "grossly" was added to the statute. In a February 6, 1985, Memorandum to the House Ways and Means Committee, Griggs briefly described H.B. 2125, which included the addition of the term "grossly" to conduct unbecoming a state officer or employee, as modifying several CSA statutes and related personnel statutes. He indicated only that "[t]he majority of the changes were suggested by the Division of Personnel Services and constitute minor revisions." Minutes, House Ways and Means Comm., February 11, 1985. Thus, the legislative history provides this court little guidance in defining these terms.

## b. Definition Adopted by Court of Appeals

The terms "gross misconduct" and "conduct grossly unbecoming a state officer or employee" have not been defined by the legislature in this context, nor were they defined by KSU, the PRC, the Board, or the district court, all of which simply concluded that

Jones' actions constituted gross misconduct or conduct grossly unbecoming a state officer or employee. The Board made this determination by examining the totality of the circumstances. The Court of Appeals majority opinion was the first to adopt a specific definition for these terms.

In reviewing the history of the statute, the majority noted:

"K.S.A. 75-2949f was added after this court's decision in *Swezey v. State Department of Social & Rehabilitation Services*, 1 Kan. App. 2d 94, 562 P.2d 117 (1977). In *Swezey*, this court held:
'Legal cause for dismissal exists if the facts disclose the employee's conduct is of a substantial nature and directly impairs the efficiency of the public service, but there must be a real and substantial relation between the employee's conduct and the efficient operation of the public service; otherwise, legal cause is not present.' 1 Kan. App. 2d at 100.

By thereafter enacting K.S.A. 75-2949f, this court subsequently concluded the legislature intended to establish a category of conduct that is per se cause for discipline, obviating the need for the Board to make a case-by-case determination whether there was direct impairment of the public service. *Sanstra v. Kansas Highway Patrol*, 15 Kan. App. 2d 148, 151, 804 P.2d 1009, *rev. denied* 248 Kan. 996 (1991). At no time thereafter has the legislature specifically defined 'gross misconduct' or 'conduct grossly unbecoming' within the CSA; in fact, the terms 'gross' and 'grossly' now appear throughout the statute without specific definitions." 32 Kan. App. 2d at 322.

The majority ultimately adopted the definition of gross misconduct provided now in K.S.A. 2003 Supp. 44-706(d)(1) relating to disqualification from unemployment benefits:

"We conclude that, for purposes of K.S.A. 75-2949f(a), ordinary misconduct is to be distinguished from gross misconduct, and conduct unbecoming an officer is to be distinguished from conduct 'grossly' unbecoming an officer. Particularly since the legislature concluded that the addition of 'grossly' was worthy of a specific amendment in 1985, we must conclude that insertion of such terms in qualifying the conduct justifying dismissal was not meaningless and should not be disregarded. See *Todd v. Kelly*, 251 Kan. 512, 515, 837 P.2d 381 (1992). Although we decline to establish a general rule that would serve to define 'gross misconduct' in every case, we believe that the legislature intended that 'gross' and 'grossly' in the language of K.S.A. 75-2949f(a) mean something significantly more than ordinary misconduct. Notwithstanding our refusal to provide a missing statutory definition for all purposes, we are convinced that in order for misconduct to be 'gross,' it must be aggravated, extreme, or wanton in nature, evincing a knowing

and reckless disregard for the rules, policies, or other standards of appropriate behavior." 32 Kan. App. 2d at 325.

While the majority opinion specifically declined to establish a general rule, it essentially did just that by defining the term gross misconduct. However, the Court of Appeals correctly points out that the legislature intended to establish per se causes for discipline and defining the terms merely provides the Board with guidance in differentiating between ordinary misconduct and gross misconduct in the realm of the Kansas Civil Service statutes. However, as discussed below, we decline to adopt a single definition but rather employ several methods to aid in our interpretation of the statute.

The Court of Appeals reliance solely upon K.S.A. 2002 Supp. 44-706(b)(1) (now K.S.A. 2003 Supp. 44-706[d][1]) as providing a definition is misplaced. K.S.A. 2003 Supp. 44-706(d)(1) provides in relevant part:

"(d) If the individual has been discharged for misconduct connected with the individual's work . . . [and] is discharged for gross misconduct . . . such individual shall be disqualified for benefits . . . [and] all wage credits attributable to the employment from which the individual is discharged for gross misconduct . . . shall be canceled.

"(1) For the purposes of this subsection (d), 'misconduct is defined as a violation of a duty or obligation reasonably owed the employer as a condition of employment. The term 'gross misconduct' as used in this subsection (d) shall be construed to mean conduct evincing extreme, willful or wanton misconduct as defined by this subsection (d)."

Significant differences exist between the CSA and the Employment Security Law, K.S.A. 44-701 *et seq.* The two statutory schemes are enforced by different agencies, and the policies behind the two acts differ significantly. While the CSA is designed to balance the rights of state employees to employment decisions based on merit against the need for the State to maintain an efficient workforce to carry out government functions, the Employment Security Law was designed to protect individuals and the public good from the impact of involuntary unemployment. See K.S.A. 44-702; K.S.A. 75-2925.

If the legislature had intended this definition to apply under K.S.A. 75-2949f, it could have used the definition or, at the very

least, referenced the definition now set forth in K.S.A. 2003 Supp. 44-706(d)(1). Moreover, this definition overlooks the definition of "conduct grossly unbecoming a state officer or employee." We conclude that the Court of Appeals improperly interpreted K.S.A. 75-2949f by applying this definition of gross misconduct from the Employment Security Law.

The terms "gross misconduct" and "conduct grossly unbecoming a state officer or employee" were not specifically defined because their meanings within the context of legislation involving state employees are not unfamiliar. For a number of years, these terms have provided guidance to state employers and employees. Their meanings are perhaps similar to the conduct suggested by the definition set forth in K.S.A. 2003 Supp. 44-706(d)(1) but not as rigid or narrow as suggested by the Court of Appeals. The meanings of these terms are best defined in the dictionary and within the context of K.S.A. 75-2949(f) under the totality of the circumstances.

First, the dictionary defines "gross" as "glaringly noticeable usually because of inexcusable badness or objectionableness." Webster's New Collegiate Dictionary 507 (1973). Black's Law Dictionary 702 (6th ed. 1990), defines "gross" as "[o]ut of all measure; beyond allowance; flagrant; shameful; as a gross dereliction of duty, a gross injustice, gross carelessness or negligence. . . . Such conduct as is not to be excused." Misconduct is defined as "[a] transgression of some established and definite rule of action, a forbidden act, a dereliction from duty, unlawful behavior, willful in character, improper or wrong behavior." Black's Law Dictionary 999 (6th ed. 1990).

Second, the statutory construction doctrine of *noscitur a sociis*, which literally means "it is known from its associates," is an ancient and well known maxim that is a common sense aid to the construction of doubtful language. This doctrine may be applied when the meaning of a word or phrase might be obscure or doubtful when considered in isolation to clarify or ascertain by reference to those words or phrases with which it is associated. When taken in context, a word may have a broader or narrower meaning than it might have if used alone. *State v. Zabrinas*, 271 Kan. 422, 432, 24 P.3d 77 (2001).

Other grounds for discipline listed under K.S.A. 75-2949f include a criminal conviction; immoral conduct; willful abuse or misappropriation of state funds, materials, property, or equipment; making a false statement of material fact in the employee's application for employment or position description; participation in any action that would in any way seriously disrupt or disturb the normal operation of the agency, institution, department, or any other segment of state government; trespassing on the property of any state official or employee for the purpose of harassing or forcing dialogue or discussion from the occupants or owners of such property; willful damage to or destruction of state property; willful endangerment of the lives or property of others, or both; possession of unauthorized firearms or other lethal weapons while on the job; performing duties in a brutal manner, or mistreating, neglecting, or abusing a patient or resident or other person in the employee's care; refusal to accept a reasonable and proper assignment from an authorized supervisor (insubordination); being under the influence of alcohol or drugs while on the job; knowingly releasing confidential information from official records; use of the employee's state position, use of the employee's time on the state job or use of state property or facilities by the employee in connection with a political campaign; exhibiting other personal conduct detrimental to state service which could cause undue disruption of work or endanger the safety of persons or property of others, as may be determined by the appointing authority; gross carelessness or gross negligence; grossly improper use of state property; and sexual harassment arising out of or in connection with employment. K.S.A. 75-2949f(b)-(s).

Finally, review of what other actions have constituted gross misconduct is helpful to this analysis. We note that while the Court of Appeals cited several cases from other jurisdictions where officers committed much more egregious acts which warranted dismissal, only one of those cases involved the term "gross misconduct." See *City of Minneapolis v. Moe,* 450 N.W.2d 367, 370-71 (Minn. App. 1990). As such, the persuasiveness of those cases is minimal.

The following cases provide some guidance as to what other courts have considered to constitute gross misconduct. See *De-*

*partment of Employment v. Owens*, 75 Md. App. 472, 479, 541 A.2d 1324 (1988) (gross misconduct for employee to threaten to kill his supervisor); *Stafne v. City of Center City*, unpublished opinion, 1998 WL 778931 (Minn. App. 1998), *rev. denied* January 21, 1999 (gross misconduct for city maintenance worker to operate a city vehicle without a valid driver's license); *In re Claim of Barresi*, 232 App. Div. 2d 714, 648 N.Y.S.2d 179 (1996) (officer who misplaced his personally owned revolver and could not locate it for over a year constituted gross misconduct); *Bomar v. Tenn. Department of Mental Health*, unpublished opinion, 2000 WL 146369 (Tenn. App. 2000) (gross misconduct or conduct unbecoming a state officer for restraining a 7-year-old patient in an abusive manner); *Roach v. Regional Jail Authority*, 198 W. Va. 694, 482 S.E.2d 679 (1996) (gross misconduct for correctional officer to watch a female inmate use the toilet in her cell and fail to secure a door to the central control room).

After examining the definitions and grounds for discipline set forth above, it is clear that the legislature's use of the words "gross" and "grossly" in the statute signified that it required something significantly more than ordinary misconduct. All of the grounds for discipline are of a serious or extreme nature, and the actions are generally intentional or willful. When reviewing the cases involving gross misconduct, it appears that the actions giving rise to termination were more egregious than those committed by Jones in this case.

However, the analysis does not end there. The next issue we must consider is whether his conduct should be viewed in isolation or under the totality of the circumstances including the effect that his actions had on his ability to perform his job. The Court of Appeals refused to consider how the misconduct reflected upon Jones' credibility as a state officer or employee.

### d. Uniform Application of the Statute

The Court of Appeals majority opined that if it looked to how the officer's misconduct affected his credibility, then it would have to create a special criteria or test based upon trust for state-em-

ployed police officers. This approach would prevent the statute from being uniformly construed and applied. We disagree.

K.S.A. 75-2949f lists grounds for personal conduct detrimental to state service. As the legislature does not define the terms gross misconduct or conduct grossly unbecoming a state officer or employee, the appointing authority must decide on a case-by-case basis whether the particular misconduct was "gross." In making that determination, we believe the appointing authority should have the right to consider the totality of the circumstances in determining the severity of the misconduct, which would include not only the specific actions but the ramifications of those actions on the state officer or employee's ability to perform his or her duties. As the totality of the circumstances must be examined no matter what branch of state service is involved, the statute is still being uniformly applied. It simply means that different factors would be more or less relevant depending on what type of state service is being considered. In this case, the manner in which Jones' conduct affected his credibility was but one factor to consider in determining whether his conduct should be characterized as gross misconduct or conduct grossly unbecoming a state officer or employee.

Interestingly, the Court of Appeals majority cites *Moe,* 450 N.W.2d at 370-71, in which the Minnesota Court of Appeals found that a police officer's felonious possession of cocaine constituted gross misconduct in light of the nature of his position. The court focused on the issues of trust and integrity as it related to the misconduct:

"The image of integrity and trust is essential to the performance of a police officer's duties. There must be public confidence in law enforcement, and to ignore felonious possession of cocaine by a police officer could only serve to undermine public confidence in that office.

"This is a time in our society when the scourge of cocaine is running rampant in many parts of our country. We cannot be blind to society's concern about the adverse influence of cocaine in our midst.

"To some, the result to Moe might seem harsh. He is redirecting his life and that is commendable, but his efforts to rehabilitate are irrelevant to the issue of good cause to discharge. The issue here is the integrity of the police department and under our scope of review we must affirm." 450 N.W.2d at 370.

Turning back to this case, the Court of Appeals majority should have considered the totality of the circumstances, including the effect on Jones' integrity and credibility, in determining whether he committed gross misconduct or conduct grossly unbecoming a state officer. As discussed above, substantial competent evidence supported the Board's findings that Jones turned off the in-car camera prior to the termination of the stop and submitted a report which falsely indicated that Esping's car was legally parked. By turning off the camera, Jones destroyed evidence and unnecessarily exposed the KSU Police to Esping's charges of police misconduct. Jones sought merely to protect his own interests, by first ordering the camera to remain on when the stop appeared to be difficult and then by ordering the camera to be turned off so his actions could not be used against him by the KSU Police. He submitted a false report and failed to log in the videotaped stop making it more difficult for the videotape to be located during the investigation.

While the end result, allowing Esping to drive her car a short distance without a license, does not appear to be a major offense, the ramifications of Jones' actions seriously affected his credibility and integrity as a KSU Police officer. Under the circumstances of this case, we conclude that the Court of Appeals majority improperly substituted its judgment for that of the Board. Substantial competent evidence supports the Board's conclusion that Jones' actions constituted gross misconduct or conduct grossly unbecoming a state officer and employee sufficient to support his termination as a KSU Police officer.

Judgment of the Court of Appeals is reversed. Judgment of the district court affirming the Board's conclusion upholding Jones' termination is affirmed.

LUCKERT, J., concurring: I concur in the outcome of the majority opinion and most of the rationale but disagree with the majority's conclusion that KSU Police Department Policy and Procedure § 12.3.24 required that Gary Jones must have *intentionally* falsified the report.

The policy states in part: "An officer shall not make or submit any false or inaccurate reports . . . ." Nothing in this portion of

the policy imposes a scienter requirement. In contrast, the remaining portion of the policy prohibits an officer from "knowingly" entering or causing to be entered into a report any inaccurate, false, or improper information. Hence, a distinction is made between the officer who makes or submits the report and thus commits a per se violation of the policy and the officer who provides information to be placed in a report who commits a violation only if acting with intent.

The majority does not explain why it interprets the policy to require that an officer who makes or submits a report must do so with the intent to state a falsehood or inaccuracy. Intent may be a factor in determining if there is gross misconduct, but the majority does not discuss the intent requirement in this context. In fact, the majority's discussion of gross misconduct is consistent with a determination that the lack of trust which can result because of a false report, whether resulting from negligence or intentional falsehood, is a basis to determine that submission of a false report is gross misconduct.

If the policy is applied as written rather than as construed by the majority, Jones violated the policy by making and submitting a false or inaccurate report regardless of whether he did so intentionally. Therefore, the Kansas State Civil Service Board (Board) made an adequate finding when it stated: "11. Mr. Jones stated in his report that Ms. Esping's vehicle was legally parked at the time of the stop . . . . Ms. Esping's vehicle was not legally parked at the time of the traffic stop." This finding establishes that Jones made the report and that the report was false or inaccurate, thus establishing a violation of the policy.

Consequently, the majority need not and should not have engaged in the questionable analysis of whether the Board must have meant, although it did not specifically find, that Jones had intentionally submitted a false or inaccurate report.

MCFARLAND, C.J., and BEIER, J., concur in the result.