No. 90,975

BENNY TITTERINGTON, DECEASED, *Appellee,* v. BROOKE INSURANCE, and CONTINENTAL WESTERN INSURANCE CO., *Appellants.*

(89 P.3d 643)

Opinion filed May 14, 2004.

*Mark A. Buck,* of Fairchild & Buck, P.A., of Topeka, argued the cause, and *Nathan Burghart,* of the same firm, was with him on the brief for appellants.

*William L. Phalen,* of Pittsburg, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: This is an employer's appeal from an award of benefits by the Workers Compensation Board. Benny Titterington was a salesman for Brooke Insurance Company (Brooke) who died after his car left the highway and then struck an embankment. An administrative law judge (ALJ) approved the claim for benefits filed by Titterington's surviving spouse and dependent children. The Board affirmed, and Brooke appealed, claiming Titterington died as a result of a heart attack and an award therefore was barred by K.S.A. 44-501(e), the so-called heart amendment. The case was transferred from the Court of Appeals pursuant to K.S.A. 20-3018(c).

The issues on appeal, and this court's accompanying holdings, are as follows:

1. Did the Board err in finding that claimant's cause of death was not coronary heart disease? No.
2. Did the Board err in finding that claimant's death arose out of and in the course of his employment? No.

Accordingly, we affirm.

FACTS:

Titterington was an insurance salesman for Brooke, which had offices in Columbus and Pittsburg. Brooke required him to work in Columbus and to provide his own transportation between the two towns so he could also call on clients in Pittsburg and work out of the Pittsburg office. His job required him to drive between the two offices on almost a daily basis.

According to Titterington's wife, Susan, he normally traveled between the offices on Highway 69. On April 18, 2001, the day of the accident, he went to the Columbus office to work. He had set business hours and would not quit before 5 p.m.

Titterington's daughter, Meghan, testified she had a telephone conversation with him around 4 p.m. the day of the accident. He called to say he was on his way from the Columbus office to the Pittsburg office where he was going to do some work and to make a client call. Consequently, Titterington asked his daughter to pick up her mother from work for him.

Shirley Hartley and Mary Harding were the only witnesses to Titterington's accident. Harding testified she did not see Titterington's car as it left the highway, but later she saw the car go down the highway slope. The car's brake lights never came on. She saw no road construction, nothing blocking the road, and no animals running across the road that would have caused the red car to have left the roadway.

Hartley testified that the accident occurred south of Pittsburg on Highway 69. She first noticed the red car because it was traveling on the wrong side of the road for two or three car lengths. It then drifted into the correct lane for two or three car lengths and onto the shoulder for about 100 feet. Hartley's car was traveling about 65 miles per hour, and Hartley estimated that the other car

was traveling 60 miles per hour. She never saw the brake lights come on, nor did she see any animals or construction. There was no other traffic on the road.

According to Hartley, Highway 69 has shoulders about the width of a car. Past the shoulder was an embankment and then a field, which is about 10 feet lower than the road. She testified that after the car went off the road, it angled to the north until it hit the flat ground and then it went straight north, parallel to the road. The car came to a very sudden stop 50 feet from the shoulder when it struck the north bank of a slough, *i.e.*, a drainage ditch with knee-high water. Water and mud flew in every direction.

Derek Edmondson, a deputy sheriff for Cherokee County, investigated the accident. He testified that the highway is relatively flat and straight where the accident occurred. He measured 798 feet from where the front wheels left the pavement to where the red car stopped in a water-filled ditch 2 to 3 feet deep. There were no indications of skid marks or braking activity, and the car struck with such force that it was embedded in the mud bank. The EMS crew told him they believed the driver probably experienced some type of medical event, possibly cardiac, prior to the accident occurring.

Edmondson performed no calculations to estimate speed at the point of impact and did no testing of the brakes or steering mechanism. Susan Titterington later testified that the car had never before gone out of control or swerved without reason. As far as she knew, it was in good mechanical condition and the tires were good.

James Loumiet, who specializes in accident reconstruction and highway safety analysis, was hired by Brooke to investigate the accident. His report contained the following preliminary opinions:

"1. The path traveled by the Titterington vehicle after it left Highway 69 indicates that the Titterington vehicle was neither braked nor steered after it left the roadway, either because Mr. Titterington was unable to do so, or unwilling to do so. The vehicle traveled approximately 800 feet to final rest after it left the roadway, where it impacted a ditch embankment, causing significant damage to the vehicle. Yet even with a moderate level of braking, the vehicle should have been able to stop within 400 feet. Thus, if Mr. Titterington had braked after leaving the roadway, he would have been able to stop well short of the ditch embankment. Ms. Hartley's deposition testimony that she never saw the brake

lights come on and that the vehicle didn't slow before it hit the ditch embankment also supports the conclusion that the Titterington vehicle was never braked after it left the roadway.

"2. For the Titterington vehicle to travel 800 feet at a constant speed of 65 mph would take over 8 seconds. If the Titterington vehicle left the roadway at 65 mph and hit the ditch embankment at 30 mph, it would have taken over 11 seconds to travel the 800 feet. In either case, if Mr. Titterington had been able to brake his vehicle, he had ample time and distance to stop his vehicle well short of the ditch embankment.

"3. There is no evidence to indicate that anything related [to] the roadway or vehicle caused or contributed to the loss of control of the Titterington vehicle. The damage to the right front tire was probably caused by the impact with the ditch embankment. According to Officer Edmonson, there were no tire marks on the roadway. If the tire had blown on the roadway, it probably would have left marks on the roadway.

"4. Considering all of the above-referenced facts and conclusions and the materials I reviewed, and considering Mr. Titterington's erratic driving before leaving the roadway *leads me to conclude that Mr. Titterington's loss of control and failure to stop before reaching the ditch embankment was solely a result of his inability or unwillingness to control his vehicle.*" (Emphasis added.)

Dr. Mark Harrell was working at St. John's Regional Medical Center in Joplin, Missouri, on April 18, 2001, as an emergency medicine physician when Titterington was brought in at 5:10 p.m. Titterington showed no signs of life.

Dr. Harrell observed that Titterington had a significant abrasion all the way across his chest, indicating a tremendous amount of physical force applied from the seat belt. He found bruising from the seatbelt abrasion, but no bleeding and no evidence that Titterington's chest had struck the steering wheel. He also observed air in Titterington's subcutaneous tissue, indicating it had been forced out of the lung cavity itself and into the tissue. These findings signified to him a major trauma.

Harrell then placed tubes in both sides of Titterington's chest to check for the presence of blood. He noticed blood coming out of the left chest tube, signifying a large vessel rupture in the chest. According to Dr. Harrell, the left chest is the site of most chest bleeds caused by trauma; finding a large amount of blood there is consistent with massive chest trauma and death as a result of that chest trauma.

Harrell next performed a pericardiocentesis by placing a needle in the sac around the heart. He recovered about 2 cc's of nonclotting blood, indicating the blood had extruded from the heart into the sac. He testified that this amount of blood accumulation in the sac around the heart causes great pressure and can cause the heart not to beat. Dr. Harrell stated this physical finding is also consistent with massive chest trauma and death as a result of that chest trauma.

Harrell knew that someone on the medical crew questioned whether Titterington was in cardiac arrest before he had the accident. He found nothing, however, to substantiate that theory, either in his physical findings or in testimony from witnesses. He explained that in a heart attack, one would not expect to find a large amount of blood from the left chest tube or 2 cc's of nonclotting blood in the sac. Moreover, in a heart attack, the blood would not have flowed into the chest cavity. Finally, the air found in the subcutaneous tissue is not dependent on the function of the heart.

As a result, Harrell concluded Titterington did not die of a heart attack and placed "massive chest trauma" as the cause of death on Titterington's death certificate. He admitted, however, that he did not know the specifics of Titterington's cardiac history. He acknowledged that risk factors for heart attacks include being male, family history of heart disease, smoking, high blood cholesterol, and high blood pressure.

Dr. Jeffrey Curtis, a cardiologist hired by Brooke, examined Titterington's medical records, Dr. Harrell's deposition transcript, and statements from Harding and Hartley. The records disclosed that Titterington had prior heart problems. In 1990, when he was 40, he had quadruple bypass surgery. In 1994 and 1998 he was admitted to the Mt. Carmel hospital because of chest pains; a stent was installed in his heart in 1998. In November 1999, he was admitted again because of chest pains and a separate stent was installed.

Titterington also had a family history of heart disease; his mother was 70 when she had a valve replaced. He smoked a pack of cigarettes a day and had since he was 18. At the time of the accident,

Titterington was taking Zocor for high cholesterol, Atenolol for blood pressure, folic acid, and Zestril. He carried nitroglycerin with him, but was not taking it.

In contrast, Susan Titterington testified her husband exercised three or four times a week and she was not aware of any unusual stress in his life at the time of the accident. Titterington had been to the doctor in January 2001, 3 months before the accident, and was told he was fine. Prior to undergoing earlier cardiac treatments, he had a tightness in his chest and a tingly feeling in his left arm and hand. In the weeks before his death, Titterington did not indicate to Susan that he was again experiencing these problems.

After Dr. Curtis' review of the documents, he opined that Titterington had chronic coronary artery disease for 9 years after his bypass surgery, and was continuing to have symptoms of his ischemic heart disease with chest pain and significant progression of coronary and artery blockage disease. Curtis' opinion, considering Titterington's medical history, is that one of two things happened to Titterington:

"One is he either suffered an acute coronary thrombosis, which is the same as an acute myocardial infarction, and then suffered arrhythmic cardiac death or ventricular fibrillation which would cause him to immediately pass out and be unconscious and unable to control the car. Or I think more likely, he just had a primary sudden cardiac death due to sudden ventricular fibrillation and suddenly passed out on the road and therefore was unconscious and unable to control the car."

He further explained that "[W]hen someone develops ventricular fibrillation, they pass out within 5 seconds and unless resuscitated with electrical countershock are essentially dead at that time. The heart is not beating, breathing ceases, unconsciousness happens immediately."

In short, Dr. Curtis rejected Dr. Harrell's claim of death by massive chest trauma. He concluded Titterington experienced sudden cardiac death in his car shortly after it left the highway or as it was leaving the highway. In his view, Titterington was clearly and clinically dead before his car hit the enbankment.

ANALYSIS:

The Workers Compensation Act specifically adopts the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions

(KJRA), K.S.A. 77-601 *et seq.*, for workers compensation appeals. K.S.A. 44-556(a). The appellate court's review of the Board's decision "shall be upon questions of law." K.S.A. 44-556(a). The determination of whether the Board's findings of fact are supported by substantial competent evidence is such a question of law. *Mudd v. Neosho Memorial Regional Med. Center,* 275 Kan. 187, 191, 62 P.3d 236 (2003).

In workers compensation cases, substantial evidence is evidence possessing something of substance and relevant consequence and carrying with it fitness to induce conviction that the award is proper, or furnishing a substantial basis of fact from which the issue tendered can be reasonably resolved. We review the evidence in the light most favorable to the prevailing party and do not reweigh the evidence or determine the credibility of witnesses. *Mudd,* 275 Kan. at 191-92.

In proceedings under the Workers Compensation Act, the burden of proof shall be on the claimant to establish the claimant's right to an award of compensation and to prove the various conditions on which the claimant's right depends. K.S.A. 44-501(a).

Issue 1: *Did the Board err in finding that claimant's cause of death was not coronary artery disease?*

The Board considered the testimony of Dr. Mark Harrell, the first physician who attended Titterington after the accident. Although someone on the medical crew questioned whether Titterington was in cardiac arrest before he had the accident, Harrell testified that his observations from the tubes he placed in Titterington's chest and the needle he placed in the sac around the heart were inconsistent with a heart attack. These observations and others were, however, consistent with massive chest trauma. Accordingly, in his medical opinion, the cause of death was massive chest trauma due to the car striking the embankment.

Brooke responds that the overwhelming evidence—primarily the opinion of Dr. Curtis, who never examined Titterington—showed Titterington died of coronary disease prior to his car striking the embankment.

The Board weighed the conflicting evidence and apparently found Harrell's testimony convincing. It stated:

"Specifically, the Board finds decedent's cause of death was not coronary artery disease. Instead, decedent died from the blunt chest trauma he sustained when his vehicle struck an embankment.

"Why the decedent's vehicle left the road is unknown. But it is not necessary that the accident's cause be proven for the death to be compensable. It is necessary, however, that the cause of death not be coronary artery disease. *The greater weight of the credible medical evidence is that the decedent's heart was still pumping when the impact occurred. Accordingly, decedent had not suffered sudden cardiac death and was not 'clinically dead' before his vehicle came to a sudden stop when it struck the embankment.*" (Emphasis added.)

Harrell's expert testimony supplies the substantial competent evidence needed to support the Board's finding that Titterington did not die of a heart attack. Although there was evidence leading to the opposite conclusion, this court does not reweigh the evidence. Additionally, based upon the Board's finding that the cause of death was blunt chest trauma, and not by a cardiac event, we agree with the Board that the heart amendment, K.S.A. 44-501(e), is not implicated ("Compensation shall not be paid in case of coronary or coronary artery disease or cerebrovascular injury unless it is shown that the exertion of the work necessary to precipitate the disability was more than the employee's usual work in the course of the employee's regular employment.").

Brooke greatly emphasized at oral arguments that Titterington's heart attack, if it did not directly kill him, was at least the proximate cause of why his car left the highway and struck the embankment. The Board found that the reason his car left the roadway is unknown. More important, however, the phrase "proximate cause" does not appear in Brooke's brief. Moreover, the brief does not otherwise sufficiently identify the concept so it may be considered on appeal. Certainly no authorities are cited. Titterington's response brief does not address the issue, either by legal label or by general concept, which further demonstrates that Brooke's brief was insufficient to timely put opposing counsel and this court on notice that it was part of this appeal.

Accordingly, we need not address the proximate cause issue because at best it was only incidentally raised in Brooke's brief. It is therefore deemed abandoned. *McKissick v. Frye*, 255 Kan. 566, 578, 876 P.2d 1371 (1994) (A point incidentally raised but not argued is deemed abandoned.).

Issue 2: *Did the Board err in finding that claimant's death arose out of and in the course of his employment?*

Brooke next argues that no competent evidence supports the Board's finding that Titterington was acting in the course of his employment as is claimant's burden under K.S.A. 44-501. The Board stated: "The Board further finds that decedent's accident arose out of and in the course of his employment because the decedent was traveling from respondent's Columbus, Kansas, office to its Pittsburg, Kansas, office when the accident occurred. Thus, travel was incident to and a hazard of the decedent's employment."

The question of whether there has been an accidental injury arising out of and in the course of employment is a question of fact, and its determination will not be disturbed by this court where there is substantial competent evidence to support it. *Harris v. Bethany Medical Center*, 21 Kan. App. 2d 804, 805, 909 P.2d 657 (1995). The determination of whether the Board's findings of fact are supported by substantial competent evidence is a question of law. *Mudd*, 275 Kan. at 191.

Susan Titterington testified that her husband was an insurance salesperson for Brooke which had offices in Columbus and Pittsburg. Titterington was required to drive between the two to make calls on clients. His normal work day would last until at least 5 p.m. Titterington's accident occurred at 4:22 p.m. on Highway 69 as he was driving north between Columbus and Pittsburg. Furthermore, Meghan Titterington testified that her father called her around 4 p.m. the day he died. He told her he was on his way from the Columbus office to the Pittsburg office where he was going to do some work and make a client call. He therefore asked Meghan to pick up her mother from work.

Brooke responds that this testimony was self-serving, not competent, and should be disregarded. Under our standard of review, however, we do not reweigh evidence or determine the credibility of witnesses. Instead, this court looks for substantial competent evidence supporting the Board's finding that the Titterington accident arose out of the course and scope of his employment. The family testimony is such evidence.

Affirmed.