No. 93,868

PEGGY A. RINKE, *Claimant/Appellee,* v. BANK OF AMERICA and ROYAL & SUN ALLIANCE INSURANCE COMPANY (AMERICAN INSURANCE COMPANY), *Respondents/Appellants.*

148 P.3d 553

Opinion filed December 22, 2006.

*Terry J. Torline*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, argued the cause and was on the brief for respondents/appellants.

*Randy S. Stalcup*, of Affiliated Attorneys of Pistotnik Law Offices, PA, of Wichita, argued the cause and was on the brief for claimant/appellee.

The opinion of the court was delivered by

Nuss, J.: This case requires us to determine whether an employee is entitled to receive workers compensation when, while leaving her office building after work, she fell in an adjoining parking lot leased by her employer. Both the Administrative Law Judge (ALJ) and the Kansas Workers Compensation Board (Board) found that she was injured while on her employer's premises and therefore entitled to compensation. The Court of Appeals, however, held the lot was not part of the employer's premises and compensation was therefore excluded under the "going and coming" rule of K.S.A. 44-508(f). *Rinke v. Bank of America,* 34 Kan. App. 2d 591, 121 P.3d 472 (2005). We granted Rinke's petition for review; our jurisdiction is pursuant to K.S.A. 20-3018(b).

The issues on appeal, and this court's accompanying holdings, are as follows:

1. Does substantial competent evidence support the Board's finding that Rinke was injured on the Bank's premises? Yes.

2. Does the "special risk" exception to the going and coming rule apply? Moot.

Accordingly, we reverse the Court of Appeals and affirm the Board and the ALJ. Because the Court of Appeals' ruling reversing the Board did not require the court to address the issue raised by appellants as to whether the Board erred as a matter of law in interpreting K.S.A. 44-510(a)(4) to allow an injured worker to recover more than $50,000, we remand to the Court of Appeals to make that determination.

## FACTS

Peggy Rinke worked for the Bank of America (Bank) in Wichita. Her normal working hours were 6 a.m. to 2:45 p.m. On March 5, 2001, Rinke left work between 3:10 and 3:15 p.m., using the only door authorized for anyone to exit and enter the building.

The exit and covered walkway lead to an adjacent parking lot to the south. According to Rinke, employees have to go through the parking lot to enter and exit the building. As she approached her car parked in the lot four or five stalls from the walkway, she slipped on a patch of sand that was placed to prevent people from

slipping on an ice patch. Rinke's right hip, shoulder, and elbow hit the pavement.

At the time of the accident the Bank rented and occupied approximately 94% (156,000 square feet of space) of its building from Argora Properties, L.P. (Argora). The Bank paid $1.56 million per year in rent. The remaining 6% of the building is occupied by Wesley Occupational Services (Wesley).

This facility is essentially a telephone banking operation, with most of the employees devoted to receiving incoming calls regarding banking services. There is no sign posted informing the public the building houses a bank. Accordingly, there is no walk-in traffic, except for use of an ATM on the first floor. The building is "secured," *i.e.*, once one enters the main lobby, further access is denied unless he or she possesses an access badge.

In addition to the building, Argora also owns the parking lot. Section 1.2 of the lease agreement specifically granted the Bank the right to use, as an "appurtenance to the leased premises," the "Parking Facility" (lot). Among other things, it entitled the Bank to install and maintain a drive-up ATM facility, at the Bank's expense, in an area along the lot's eastern edge. It also granted the Bank the right to use 737 of the lot's 757 parking spaces as "reserved spaces." According to the lease agreement rider, the reserved spaces represented by the "reserved parking permits" would at all times be located within an area of the lot designated for use solely by the Bank.

The lot's 20 remaining spaces, located in the eastern and southern corner of the lot away from the building, are reserved for Wesley employees and patients. As with all others, they were authorized only to enter and exit from the one building door. The spaces are marked with a sign stating "Wesley Occupational Health Parking."

After Rinke filed her workers compensation claim, she testified that Bank employees were told they could not park in Wesley's 20 parking spaces. If they did, they were subject to being ticketed by the Wichita police department with the assistance of security. She has been ticketed for doing so. She also testified that the remaining spaces, although not marked or specifically designated for Bank employees, were utilized by them.

These non-Wesley spaces also could be utilized by the general public. Rinke testified, however, that the general public would have no reason to enter the building unless they went to Wesley's area.

Under the lease, Argora was responsible for maintenance, lighting, and security of the lot. The Bank did possess the right to have Argora, upon request, promptly tow any unauthorized vehicles parked in any reserved space or on any surface parking area.

The ALJ determined that Rinke's injuries arose out of and in the course of her employment and her injuries were compensable because the Bank "had exclusive right and control over all 757 parking spaces except for 20 specifically designated as HCA Wesley parking places." In other words, he found that the parking lot was part of the employer's premises. The Board affirmed, and the Court of Appeals reversed. *Rinke v. Bank of America*, 34 Kan. App. 2d 591.

## ANALYSIS

Issue 1: *Substantial competent evidence supports the Board's finding that Rinke was injured on the Bank's premises.*

Rinke argues that by leasing a large portion of the parking lot, the Bank effectively controlled the lot, despite maintenance and security being performed by Argora. She suggests that the appropriate test for "premises" should be whether the parking lot is leased to the employer, thus giving the employer the right to control.

In response, the Bank asserts that a "premises" rule based on the existence of a lease would conflict with the rationale articulated in *Thompson v. Law Offices of Alan Joseph*, 256 Kan. 36, 883 P.2d 768 (1994). The Bank reads *Thompson* to mean that in order for a leased lot to be part of an employer's premises, the employer must exercise control of it. The Bank asserts that its landlord, Argora, controlled the lot.

*Standard of Review*

The Workers Compensation Act specifically adopts the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.*, for workers compensation cases. K.S.A. 44-556(a). The appellate court's review of the Board's decision "shall be upon questions of law." K.S.A. 44-556(a).

The interpretation of K.S.A. 44-508(f)—containing the going and coming rule, and exceptions—is a question of law subject to de novo review. Although the Board's interpretation of the statute is persuasive, it is not binding on the courts. *Foos v. Terminix,* 277 Kan. 687, 692-93, 89 P.3d 546 (2004).

The determination of whether the Board's findings of fact are supported by substantial competent evidence is also a question of law. *Titterington v. Brooke Insurance,* 277 Kan. 888, 894, 88 P.3d 643 (2004). Whether the injury occurred on the employer's premises is a question of fact. *County of Cook v. Industrial Comm'n,* 165 Ill. App. 3d 1005, 1008, 520 N.E.2d 896 (1988). The ultimate issue here, *i.e.,* whether an accident arises out of and in the course of employment entitling Rinke to compensation, is also a question of fact. *Titterington,* 277 Kan. at 896.

In workers compensation cases, substantial evidence is evidence possessing something of substance and relevant consequence and carrying with it fitness to induce conviction that the award is proper, or furnishing a substantiating basis of fact from which the issue tendered can be reasonably resolved. We review the evidence in the light most favorable to the prevailing party below and do not reweigh the evidence or assess the credibility of witnesses. *Titterington,* 277 Kan. at 894. We must also accept as true all inferences to be drawn from the evidence which support or tend to support the findings of the factfinder. *Jones v. Kansas State University,* 279 Kan. 128, 140, 106 P.3d 10 (2005) (when under KJRA appellate court ascertains from record if substantial competent evidence supports agency findings, court must accept as true the evidence and all inferences to be drawn therefrom which support or tend to support findings of factfinder).

The burden of proof is on the workers compensation claimant to establish his or her right to an award of compensation and to prove the various conditions on which the right depends. K.S.A. 44-501(a). The party asserting the Board's action is invalid, however, bears the burden of proving the invalidity. K.S.A. 77-621(a)(1). As a result, the Bank, as the appellant, retains the burden in this court of proving the Board erred. *Foos v. Terminix,* 277 Kan. at 693.

*Discussion*

We begin our analysis by reviewing some of the tenets of workers compensation law. In any employment to which the Workers Compensation Act applies, if an employee is injured by an accident that arises out of and in the course of employment, the employer is liable to compensate the employee. K.S.A. 44-501(a). The term "arising out of and in the course of employment" was previously discussed by this court:

> "The two phrases arising 'out of' and 'in the course of' employment, as used in our Workers Compensation Act, K.S.A. 44-501 *et seq.*, have separate and distinct meanings; they are conjunctive, and each condition must exist before compensation is allowable. The phrase *'out of'* employment points to the cause or origin of the worker's accident and requires some causal connection between the accidental injury and the employment. An injury arises 'out of' employment when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Thus, an injury arises 'out of' employment if it arises out of the nature, conditions, obligations, and incidents of the employment. The phrase *'in the course of'* employment relates to the time, place, and circumstances under which the accident occurred and means the injury happened while the worker was at work in the employer's service. [Citations omitted.]" (Emphasis added.) *Kindel v. Ferco Rental, Inc.*, 258 Kan. 272, 278, 899 P.2d 1058 (1995).

While generally injuries are compensable if deemed to have "arisen out of and in the course of employment," there are limitations. K.S.A. 44-508(f) provides in relevant part:

> "The words 'arising out of and in the course of employment' as used in the workers compensation act shall not be construed to include injuries to the employee occurring while the employee is on the way to assume the duties of employment or *after leaving such duties,* the proximate cause of which injury is not the employer's negligence." (Emphasis added.)

This is known as the "going and coming" rule. *Chapman v. Beech Aircraft Corp.*, 20 Kan. App. 2d 962, 894 P.2d 901, *aff'd* 258 Kan. 653, 907 P.2d 828 (1995). This court has stated the rationale of the rule: "[W]hile on the way to or from work the employee is subjected only to the same risks or hazards as those which the general public is subjected. Thus, those risks are not causally related to the employment. [Citations omitted.]" *Thompson v. Law Offices of Alan Joseph,* 256 Kan. at 46.

Although K.S.A. 44-508(f) generally excludes compensation if an employee is injured on the way to or from work, the statute also includes a "premises" exception to the exclusion: "An employee shall not be construed as being on the way to assume the duties of employment or having left such duties at a time when the worker is on the *premises* of the employer . . . ." (Emphasis added.)

The parties, the Board, and the Court of Appeals all dissected this court's most recent workers compensation case dealing with a parking area—*Thompson v. Law Offices of Alan Joseph*, 256 Kan. 36. In the Court of Appeals' analysis after reviewing *Thompson*, however, it came to a conclusion opposite from the ALJ and Board.

A review of *Thompson* is therefore helpful. There, as part of the employment contract, Linda Thompson's employer paid for a parking space for her in a public garage across a public street from the office where she worked. On the day of the accident, she went to the fourth floor of the garage, used an enclosed overhead walkway across the public street to the office, and took an elevator to the eighth floor. The elevator exited into a hallway, which led to two offices, one of which was her employer's office. When Thompson stepped off of the elevator on the eighth floor, she slipped and fell.

Thompson argued she was on her employer's premises from the moment she parked her car, or alternatively, that she was on the premises at least at the time she fell. Neither the parking garage nor the building where she worked was owned, controlled, or maintained by her employer.

The ALJ in *Thompson* denied compensation because she was en route to work when she was injured. The decision was upheld by the Director of Workers Compensation, the district court, and the Court of Appeals. The only issue before this court was whether Thompson's injury occurred on her employer's premises under K.S.A. 44-508(f).

In construing the "premises" exception, this court noted that precedent required the employer to exercise "control" of an area in order for the place to be part of the employer's premises. 256 Kan. at 39. After this acknowledgment, this court examined three non-Kansas cases in which a claimant who fell in a parking lot adjoining the workplace was entitled to workers compensation.

*Woodruff World Travel, Inc. v. Indust. Comm.*, 38 Colo. App. 92, 554 P.2d 705 (1976); *Livingstone v. Abraham & Straus, Inc.*, 111 N.J. 89, 543 A.2d 45 (1988); and *Barnes v. Stokes*, 233 Va. 249, 355 S.E.2d 330 (1987).

This court then ruled against Thompson, holding that the parking garage was not part of the employer's premises under the following rationale:

> "In the case at bar, Employer provided parking to Linda as a fringe benefit of her employment. However, there is no evidence that Employer controlled Linda's parking in any way other than paying for her monthly parking fee. The *Barnes, Woodruff,* and *Livingstone* decisions are all distinguishable because in these cases the parking area was furnished by the employer's landlord. There is no evidence here that the owner of the building where Employer rented office space also owned the public parking garage where Linda parked her car. Unlike in *Livingstone*, where employer directed its employees to park in a certain area of the lot, there is no evidence Employer engaged in such control over Linda's parking. Linda was subject to no greater risk than members of the general public who used the parking garage. The public parking garage is not part of Employer's premises." 256 Kan. at 44.

The Board also thoroughly examined *Barnes v. Stokes*, 233 Va. 249, as discussed in *Thompson*. There, Barnes was injured after work as she was walking across a parking lot adjacent to a leased two-story office building where she was employed. The employer was " 'allocated a certain portion of the parking lot' sufficient for all its employees at that location to park and was 'specifically requested' to require its employees to park their vehicles in the designated area." 233 Va. at 251.

Although the employer did not own or maintain the parking lot, the *Barnes* court ultimately rejected the plaintiff's claim that she was not injured on the employer premises and therefore free to pursue a tort action against the employee who had caused her injury:

> "In the present case, while the situs of the injury was not on property owned or maintained by plaintiff's employer, nevertheless it was on premises of another that were in such proximity and relation to the space leased by the employer as to be in practical effect the employer's premises. Even though the evidence showed that members of the public who were visiting other tenants in the office building could park randomly on the lot in question, the accident sued upon occurred in the area specifically allocated to the employer and at the place where the employees were required to park their vehicles.

"As we said in *Brown* [*v. Reed*, 209 Va. 562, 566, 165 S.E.2d 394 (1969)], a parking area adjacent to a work site is a valuable fringe benefit for employees. Because that convenience reduces tardiness and enhances the desirability of a particular workplace, such a facility also benefits the employer. [Citation omitted.] Thus, consistent with the philosophy of workers' compensation, industry properly should be charged with the expense of injury which, as here, occurs at a place furnished as an incident to the employment and happens at a time when employees reasonably can be expected to use the designated area, even though the specific location is not owned or maintained by the employer." 233 Va. at 252-53.

Here, the Board followed the rationale of *Barnes* and concluded that Rinke was injured on the Bank's premises because: (1) the parking lot was adjacent to the building where she worked; (2) the Bank leased a substantial portion of the building and the parking lot; (3) the Bank was allocated a certain portion of the lot; (4) the Bank specifically requested her to park in the allocated spaces; and (5) she was injured in that designated area of the lot leased by the Bank. It correctly observed that in *Thompson* this court drew an important distinction from *Barnes*,

"finding that in *Barnes* the parking area was furnished by the employer's landlord, whereas in *Thompson*, that was not the case. However, in this instance, the parking area was owned by the same entity who owned the building, with the parking area being leased to respondent, a fact strikingly similar to *Barnes* and distinguishable from *Thompson*."

In reversing the Board's award, the Court of Appeals observed that Kansas courts, unlike the Virginia court in *Barnes*, follow the minority view and narrowly construe "premises." The court held that the correct test for determining premises was to see whether the Bank exercised control of the lot:

"[W]e consider whether substantial competent evidence supports the Board's determination that the parking lot was part of the Bank's premises, utilizing the narrower definition of 'premises' approved by the Supreme Court in *Thompson*. Specifically, we consider whether the Bank exercised control of the parking lot." 34 Kan. App. 2d at 597.

The Court of Appeals next interpreted this court's holding in *Thompson*, as quoted earlier, as supplying a specific factors test for determining the existence of premises, which it then faithfully applied to the facts of this case:

"Considering the factors considered by the court in *Thompson*, we cannot find that the Bank controlled the parking lot. Although the Bank paid Argora to lease space in the parking lot, Argora was responsible for maintenance, enforcement, towing control, and security of the parking lot during and after business hours. Bank employees did not have parking stickers or designated parking spaces in the lot. Moreover, although there were 20 spaces designated for use by Wesley, there was no evidence that the Bank directed its employees to park in any of the other 737 spaces in the lot. Nor was Rinke subjected to greater risk than the general public who used the parking lot.

"Other than the fact that the parking lot and building were leased by the Bank from the same entity, a fact mentioned as significant by the *Thompson* court, the facts of this case simply do not support a finding that the Bank had control of the parking lot. Thus, we conclude that the Board's finding that Rinke was injured on the Bank's premises was not supported by substantial competent evidence." 34 Kan. App. 2d at 597.

Because the court concluded that the premises exception did not apply, it held that Rinke's claim was not covered by the Workers Compensation Act, and it reversed the Board's contrary finding. *Rinke*, 34 Kan. App. 2d at 597-98.

In *Thompson*, we acknowledged the general premises rule with respect to parking lots:

" 'As to parking lots owned by the employer, or maintained by the employer for his employees, practically all jurisdictions now consider them part of the "premises," whether within the main company premises or separated from it. *This rule is by no means confined to parking lots owned, controlled, or maintained by the employer.* The doctrine has been applied when the lot, although not owned by the employer, was exclusively used, or used with the owner's special permission, or just used, by the employees of the employer.' " (Emphasis added.) 256 Kan. at 42 (Quoting 1 Larson's Workmen's Compensation Law § 15.42(a), pp. 4-104 to 4-121 [1953]).

We also referenced Annot., 4 A.L.R.5th 443 (reciting the above rule).

Following this recitation and the ensuing discussion of *Barnes*, *Woodruff*, and *Livingstone*, we expressly distinguished the facts of *Thompson*—where the employer paid for an employee's parking space in a public parking garage—from those three cases in the following context:

"In the case at bar, Employer provided parking to Linda as a fringe benefit of her employment. However, there is no evidence that Employer controlled Linda's parking in any way other than paying for her monthly parking fee. The *Barnes*,

*Woodruff*, and *Livingstone* decisions are all distinguishable because in these cases the parking area was furnished by the employer's landlord. There is no evidence here that the owner of the building where Employer rented office space also owned the public parking garage where Linda parked her car." 256 Kan. at 44.

The above passage reveals this court's continued adherence to the control requirement of prior case law, *e.g.*, "there is no evidence that Employer controlled Linda's parking in any way other than paying for her monthly parking fee." Language subsequent to this phrase also reveals some degree of employer control inherent in an employer's tenancy. Specifically, we noted the three cited cases "are all distinguishable because in these cases the parking area was furnished by the employer's landlord" and by contrast, "[t]here is no evidence here that the owner of the building where Employer rented office space also owned the public parking garage where Linda parked her car." In our view, this distinction includes a significant difference. Moreover, in all three cases considerably more than Thompson's single parking space was provided to employees. In *Livingstone*, the employer tenant paid for general access to its landlord's mall parking facilities through its lease agreement; in *Woodruff*, the employer's landlord provided free parking in a lot adjacent to the leased office building for all tenants' employees; in *Barnes*, the landlord provided its tenant employer access to an adjacent 50-space parking lot for its employees. For these reasons, we conclude that in those cases a much more substantial landlord and employer tenant relationship covering employee parking existed than in *Thompson*.

Accordingly, under our facts, we find some measure of Bank control inherent in its lease of 737 of 757 spaces in a parking lot for its employees working in an adjacent "secured" 150,000 square foot building which is being rented from the same landlord in the same lease. We see little practical difference between these circumstances and those where an employer owns the building and its adjoining employee parking lot. *Cf. Livingstone v. Abraham & Straus, Inc.,* 111 N.J. 89, 104 ("Under the circumstances of this case, the portion of the lot designated by [employer] for its employees' use was effectively equivalent to an employer-owned lot."); accord *Simkins v. General Motors,* 453 Mich. 703, 727, 556

N.W.2d 839 (1996) (under the going and coming rule, "an employee is injured in the course of his employment when traveling to or from work when . . . the injury occurred on property owned, leased, or maintained by the employer."); *DeHoyos v. Industrial Comm.*, 26 Ill. 2d 110, 185 N.E.2d 885 (1962) (for purposes of the premises rule, "whether the employer owns or does not own the parking lot is immaterial so long as the employer has provided the parking lot for its employees").

Our conclusion is strengthened by another attribute of control mentioned in *Thompson* and contained in *Livingstone, i.e.*, employer direction of employees on where to park. As *Thompson* distinguished: "Unlike in *Livingstone*, where the employer directed its employees to park in a certain area of the lot, there is no evidence Employer engaged in such control over Linda's parking." 256 Kan. at 44.

*Livingstone's* employer was a shopping mall anchor tenant. As part of its lease agreement with the mall owner, it paid for general access to the mall's parking facilities which it neither owned nor maintained. The employer did not have control over the entire lot nor the right to exclusively use a particular area; rather, it directed its employees to park in a certain remote area of the lot and appropriated the area to the employer's use. The New Jersey court concluded: " 'In this context, the "control" standard . . . is fully satisfied.' " *Thompson*, 256 Kan. at 43 (quoting *Livingstone*, 111 N.J. at 105).

The instant case provides even stronger facts supporting this rationale. First, the Bank has expressly leased up to 97% of the lot; the balance, 20 spaces or 3%, is specifically reserved for the only other tenant in the office building adjoining the lot. Accordingly, unlike *Livingstone*, there is no need to unilaterally "appropriate" any spaces from a common lot for Bank employees' use. Indeed, the Bank has the express authority under the lease to require landlord Argora to tow unauthorized vehicles from Bank spaces.

Second, the Bank directs its employees to not park in Wesley's 20 reserved spaces. The lease agreement supports this employer directive. Additionally, Bank employees' vehicles which are in violation are ticketed. Bank employees are requested to park in other spaces.

Third, the Bank has the right under the lease agreement to install and maintain an ATM facility, at its own expense, in an area along the lot's edge. While this entitlement does not affect the control of parking, it does indicate some added Bank control of the parking lot.

*Pierson v. Lexington Public Library,* 987 S.W.2d 316 (Ky. 1999), contains some parallels. There, the issue was whether substantial evidence supported an ALJ finding that the workers compensation claimant's injuries occurred on the operating premises of her employer. Kentucky law acknowledges a distinction between an employer's owned property and its premises but allows compensation for injuries sustained on either. See generally *Lollar v. Wal-Mart Stores, Inc.,* 767 S.W.2d 143, 148, 150 (Tenn. 1989) (in Tennessee injuries occurring while an employee is en route to or from work are compensable if they occur on the employer's premises; Kentucky employs an "operating premises" theory with liability based on the employer's control of the area).

In *Pierson,* claimant Schroeder was employed at the Lexington Public Library. The library leased approximately 144 parking spaces for staff and patrons from the owner of an adjacent parking garage. Employees were requested to park on the seventh floor of the garage, although particular spaces were not reserved for their use. They were required to descend to the first floor in order to enter the library. When Schroeder was returning from lunch, and apparently on the elevator in order to enter the library, the elevator dropped and she was injured.

She filed a workers compensation claim, alleging that she was on her employer's operating premises when the injury occurred within the course and scope of her employment. The library asserted that it did not own or operate the parking garage and that the garage therefore was not a part of its operating premises.

The ALJ found that the accident occurred on the employer's operating premises and the injuries were compensable. The Court of Appeals (preceded by the Workers Compensation Board) reversed.

The Kentucky Supreme Court acknowledged the state's "going and coming" rule but also recognized that an employer is responsible for work-related injuries that occur on its entire "operating premises" and not just at the injured worker's worksite. It affirmed

that "[o]f particular concern in making that determination [of operating premises] is the extent to which the employer could control the risks associated with the area where the injury occurred." 987 S.W.2d at 318.

It then concluded that employer control of the parking garage was present:

"The Library did not own, operate, or maintain the parking structure, and it was used by the general public as well as the Library. However, the evidence also indicates that the Library leased approximately 144 spaces in the structure, certainly making it a major customer with some degree of influence over the owner. Furthermore, the Library influenced claimant's decision over where to park by providing her with free parking in that particular garage as part of its employee benefit package. If claimant had chosen to park elsewhere in downtown Lexington, she would have been required to pay the cost of parking herself. Under those circumstances, *we are persuaded that there were sufficient indicia of employer control to support the ALJ's conclusion that the Library should be responsible for the effects of an injury to an employee which occurred in the garage*." (Emphasis added.) 987 S.W.2d at 318.

The *Pierson* court held that the Court of Appeals (and Board) impermissibly reweighed the evidence in reaching a different conclusion and reversed.

As for the purported final *Thompson* factor—"Linda was subject to no greater risk than members of the general public who used the parking garage"—we deem it irrelevant once employer control of the property, the touchstone for finding premises, has been found to exist. Even assuming "greater risk" is relevant in the determination of premises, however, we find it present in the case at bar. The Bank is a large facility where all ingress and egress is restricted to one door, with one walkway leading to one employee parking lot that Rinke testified that one has to walk through to get to and from work. The overwhelming majority of the travelers are Bank employees, followed by employees and patients of Wesley. Bank customers are understandably scarce at a "secured" facility, particularly without a sign informing the public that the building houses a bank. Public traffic is therefore minimal. See *County of Cook v. Industrial Comm'n*, 165 Ill. App. 3d 1005, 520 N.E.2d 896 (1988) ("Given these figures, it is doubtful that the small lot would accommodate much, if any, use by the public. The Commission

could reasonably infer from the evidence that the public was not exposed to the same dangers as petitioner simply because the public rarely used the lot."); see also *Jones v. Kansas State University*, 279 Kan. 128, Syl. ¶ 5, 106 P.3d 10 (2005) (court must accept as true the evidence and all inferences to be drawn therefrom which support or tend to support findings of factfinder).

We appreciate the Court of Appeals' concern about the Board's reliance upon *Barnes* because it involved an expansive interpretation of employer premises, *i.e.*, "premises of *another* that were in such proximity and relation to the space leased by the employer as to be in practical effect the employer's premises." (Emphasis added.) *Barnes*, 233 Va. at 252. However, *Pierson*, 987 S.W.2d 316, did not contain such an expansive interpretation. The court simply considered the leased parking lot to be employer "premises" after reviewing the presence of sufficient indicia of employer control.

Another such case is *County of Cook v. Industrial Comm'n*, 165 Ill. App. 3d 1005. There, the court examined a "premises" situation similar to the case at bar. Claimant worked as a judge's legal secretary for Cook County, which leased space in a building from the City of Harvey for offices and courtrooms. While eating lunch, claimant was stabbed in her car in a parking lot adjoining the building. The ALJ found the injury occurred in a parking lot leased by the county from the city for its employees' use and the injury was compensable. The Commission and district court affirmed.

The *County of Cook* court held that her injuries would be compensable if the parking lot were considered a part of the employer's premises. 165 Ill. App. 3d at 1008. Citing *C. Iber & Sons, Inc., v. Industrial Comm'n*, 81 Ill. 2d 130, 407 N.E.2d 39 (1980), the court acknowledged: "Whether the employer owns the parking lot is not always material. It is sufficient if the lot is provided for the use of the employee." 165 Ill. App. 3d at 1008.

The court noted that the lease made no reference to parking spaces but that the lot was adjacent to a city building where the county leased office space. It also noted that the lot contained about 40 spaces.

Claimant testified she had been assigned a permanent parking space which was several feet from one of two outside doors on that

side of the building. The door was for county personnel and would not open to the public. She also testified that four spaces were assigned for certain county employees. The remaining spaces were for city hall parking. Other city employees could use the lot, but their spaces were not assigned. There were 25 or 30 county employees working in the courthouse, and they also used the parking lot. She believed that the general public also used the lot.

Claimant's judge testified the lot was restricted to city employees and county employees of the court, and the city issued vehicle stickers to cars permitted to park there. He also testified, however, that the public would park there.

The evidence disclosed that the city not only owned but also maintained the lot. Accordingly, the employer county argued that its claimant was not injured on its premises because it did not establish, own, or maintain the parking lot. In rejecting this argument, the court held: "The fact that the employer leases space and the area where the injury occurs is used by other tenants or the public does not necessarily mean it is not the employer's 'premises.' " 165 Ill. App. 3d at 1009. Consequently, "[i]n view of these facts, the Commission was entitled to find [in Illinois, as an issue of fact] that the injury occurred on the 'employer's premises' for purposes of determining whether the injury was sustained in the course of the employment." 165 Ill. App. 3d at 1009.

Although not addressed by the *County of Cook* court, the Illinois Supreme Court has held that "the employer's control or dominion over the parking lot is a significant factor in the analysis" of determining whether an employee is entitled to compensation sustained in a parking lot "provided by" the employer. See *Joiner v. Industrial Comm'n,* 337 Ill. App. 3d 812, 816, 786 N.E.2d 627 (2003) (citing *Doyle v. Industrial Comm'n,* 95 Ill. 2d 103, 108, 447 N.E.2d 310 [1983]). Consequently, implicit in the *County of Cook* decision is a finding of some degree of control by the employer county over the city's parking lot where the claimant employee parked in an area reserved for her and some other county employees.

As mentioned, the Board in the instant case determined that Rinke was injured on the Bank's premises because: (1) the parking lot was adjacent to the building where she worked; (2) the Bank

leased a substantial portion of the building and the parking lot; (3) the Bank was allocated a certain portion of the lot, *i.e.*, 737 of 757 parking spaces; (4) the Bank specifically requested her to park in the allocated spaces; and (5) she was injured in that designated area of the parking lot leased by Bank.

Substantial competent evidence clearly supports the Board's findings (1), (2), (3), and (5). As for (4), the evidence established that the Bank informed its employees they could park anywhere in the lot but the reserved spaces for Wesley. While Rinke's testimony is not entirely clear whether the Bank specifically requested her to park in its allocated spaces, or whether the Bank simply directed her to not park in the Wesley spaces, the lease agreement rider provides that the Bank's 737 reserved spaces would be located within an area of the lot designated for that sole purpose by the Bank. As a result, the Board's finding is a proper inference to be drawn from these pieces of evidence. See *Jones v. Kansas State University,* 279 Kan. 128, Syl. ¶ 5.

In short, substantial evidence not only supports these Board findings, but also the Board's ultimate finding that Rinke's injury occurred on the Bank's premises. Because we have determined that Rinke was injured on the Bank's premises, it is unnecessary to consider whether the "special risk" exception to the going and coming rule applies.

The judgment of the Court of Appeals is reversed. The judgment of the Board is affirmed. The case is remanded to the Court of Appeals to address the issue whether the Board erred as a matter of law in interpreting K.S.A. 44-510(a)(4) to allow an injured worker to recover more than $50,000.

LUCKERT, J., not participating.
LOCKETT, J., Retired, assigned.