NOT DESIGNATED FOR PUBLICATION

No. 118,327

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ASHLEY P. FISHMAN,
*Appellee*,

v.

U.S.D. 229,
*Appellant*.

MEMORANDUM OPINION

Appeal from Workers Compensation Board. Opinion filed July 20, 2018. Affirmed.

*Christopher J. McCurdy* and *Ryan D. Weltz*, of Wallace, Saunders, Austin, Brown & Enochs, of Overland Park, for appellant.

*Kevin J. Kruse*, of Beam-Ward, Kruse, Wilson & Fletes, LLC, of Overland Park, for appellee.

Before GARDNER, P.J., PIERRON, J., and WALKER, S.J.

PER CURIAM: U.S.D. 229 appeals the decision of the Workers Compensation Board (Board) which found that injuries suffered by Ashley P. Fishman arose out of her employment with U.S.D. 229. Finding no error in the Board's decision, we affirm.

FACTS

U.S.D. 229 employed Fishman as a paraprofessional for special education students at Blue Valley Southwest High School. Fishman sustained a severely broken pinky finger while in the gym with her assigned student on August 26, 2014.

1

On the date of the accident, Fishman was assigned to watch Julia, a nonverbal, disabled student. During gym class, Julia was strapped into and rode a specialized three-wheeled bicycle. Julia sometimes had to be reminded to steer the bicycle and sometimes had to be helped out of the way of other students.

About five minutes before she broke her finger, Fishman climbed onto and lounged on the bleachers. Shortly thereafter, Fishman began tossing a football back and forth with Matt Reid, another paraprofessional, who was a short distance away. This initial period of tossing lasted between 25 to 30 seconds. Slightly more than a minute later, Reid and Fishman once again began playing catch, this time from about half the gym away. Roughly two minutes later, Reid threw Fishman the football again. This time, however, while jumping off the bleachers to catch the ball, Fishman broke her right pinky finger. During this time, Julia was riding her bicycle around the gym, spending slightly more than half the time on the side closest to Fishman.

Fishman sought to have U.S.D. 229 provide medical treatment for her broken finger. The school district denied Fishman's request and advised her that treatment would have to be on her own. Fishman then filed an application for hearing with the Board.

In Reid's deposition, he testified that the paraprofessional assigned to Julia needed to be near her because she would put things in her mouth or leave without guidance. Reid acknowledged different paraprofessionals watched Julia ride the bicycle differently. However, he also suggested that, if he had been assigned to Julia, he would have been on the floor with her. Reid conceded it was difficult to stay right next to Julia, and Fishman could have reached Julia within seconds if Julia needed assistance. Reid testified he began tossing the football to Fishman to get her to leave the bleachers and interact with kids. Reid also testified he never intended for Fishman to catch the last throw of the football; he intended to throw the ball short of the bleachers and was surprised when

Fishman tried to catch the it. His intention was to get Fishman engaged in the activities that were going on.

Sidney Cumberland, the risk manager for U.S.D. 229, testified he investigated the injury by reviewing the videotape of the incident and speaking with the assistant principal. He indicated Fishman's worker's compensation claim was denied because she was not performing her job duties when the incident occurred. He continued:

> ". . . She is a para, and she was assigned a student. . . . Her job was to be with that student. A student is handicapped obviously. In this situation—I'm going by memory. This student was riding a bike in the gym. She is a fragile student, and somebody needs to be with her at all times while she's riding that bike because if she falls, she could injure herself severely so someone needs to be with her at all times when she is operating the bike.
> . . . .
> "Q. . . . And so since [Fishman] wasn't with [Julia], [Fishman] wasn't performing the functions of her job?
> "A. That was what the adjuster came to the conclusion of, yes."

Cumberland also admitted he had no idea what the paraprofessionals and students typically do during gym. However, he indicated Fishman's job was to be at Julia's side and, if she had been, "there would have been no room to play football." Cumberland indicated he believed Reid was reprimanded for throwing the football and believed Fishman was terminated as an employee. Cumberland also admitted he had no idea whether Fishman had received any training on how to perform her job during gym.

Fishman testified she became a full-time paraprofessional about two weeks before her injury. She indicated Julia could not fall off the bicycle because Julia's feet were strapped in with Velcro and she wore a seatbelt. In addition, Fishman testified Julia rode the bicycle pretty quickly, and there was no way she could keep up with Julia because she

3

was not especially active. But because she was watching Julia from the bleachers, it would not take her more than 10 seconds to reach Julia if Julia needed assistance.

Fishman testified she had received no training on how to perform her job during gym class. She explained that Julia's teacher was unhappy about the accident and told Fishman she should have been right next to Julia instead of playing catch. But before the injury, Julia's teacher had not explained to Fishman that she needed to monitor Julia in this way during gym. Fishman indicated no one had ever told her not to throw or catch a football. She testified that if she had not tried to catch the football, it would have struck her in the face. Fishman indicated during the two weeks prior to her injury, the paraprofessionals, while in gym class, had participated in sports and other physical activities including basketball, football, golf, and volleyball.

Fishman also testified that after the accident her right-hand grip strength was less than half of her left hand's grip strength. She stated she lived with daily pain in her right hand, and was no longer able to bowl or do yoga.

Dr. Lynn Ketchum, a board certified hand surgeon, concluded that Fishman had an impairment of 17% of her right hand. Dr. Prem Parmar, an orthopedic surgeon, concluded Fishman had an impairment of 7% of her right hand.

After reviewing all the evidence, the administrative law judge (ALJ) found Fishman was a willing participant in a prohibited "sportive event." The ALJ also found U.S.D. 229 did not tolerate Fishman's activity. As a result, the ALJ found Fishman's injury did not arise out of her employment with U.S.D. 229 and denied her worker's compensation claim.

Fishman appealed to the Board. Citing *Servantez v. Shelton*, 32 Kan. App. 2d 305, 311, 81 P.3d 1263 (2004), the Board held "work being performed in a forbidden manner

is not prohibited, as would be the case with the performance of prohibited work. An employee is still acting in the course of his or her employment even while performing work in a prohibited manner." The Board reversed the ALJ's award and remanded the case to the ALJ for a determination of the issues yet to be resolved.

On remand, the ALJ determined U.S.D. 229 was responsible for all of Fishman's medical expenses resulting from the injury. Based on a 7% loss of use for Fishman's hand, the ALJ awarded Fishman $3,392.81 in temporary total disability compensation and permanent partial disability compensation.

U.S.D. 229 appealed this finding to the Board, contending Fishman's injury did not arise from her employment. The Board again found Fishman's injury arose out of her employment with U.S.D. 229, and her injury was compensable. However, the Board also determined Fishman suffered a 12% permanent partial functional impairment. As such, it increased the award for temporary total disability and permanent partial disability to $4,818.95. U.S.D. 229 has timely appealed the Board's decision to this court.

ANALYSIS

*Whether Fishman's injury arose out of her employment*

K.S.A. 2017 Supp. 44-556(a) directs that final orders of the Board are subject to review under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq. The standard of review will vary depending on the issue raised. See K.S.A. 2017 Supp. 77-621.

U.S.D. 229 contends the Board erred when it found Fishman's injury arose out of her employment because she was not performing any work duties when she was injured. U.S.D. 229 argues Fishman has the burden of proving her right to compensation.

5

However, this is only half correct. The claimant has the burden of proving his or her right to compensation *to the Board*; on appeal to our court, the party asserting error has the burden to show error. *Moore v. Venture Corporation*, 51 Kan. App. 2d 132, 137, 343 P.3d 114 (2015). Before this court, U.S.D. 229 has the burden to show error.

"Whether an injury arose out of and in the course of employment is a question of fact, and we review a challenge to the Board's factual findings in light of the record as a whole to determine whether those findings are supported by substantial evidence." 51 Kan. App. 2d at 137.

We must review a challenge to the Board's factual findings in light of the record as a whole to determine whether the findings are supported to the appropriate standard of proof by substantial evidence. See K.S.A. 2017 Supp. 77-621(c)(7). "Substantial evidence" refers to "'evidence possessing something of substance and relevant consequence to induce the conclusion that the award was proper, furnishing a basis [of fact] from which the issue raised could be easily resolved.'[Citation omitted.]" *Rogers v. ALT-A&M JV*, 52 Kan. App. 2d 213, 216, 364 P.3d 1206 (2015).

K.S.A. 2017 Supp. 77-621(d) defines "in light of the record as a whole" as meaning

> "that the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review."

6

When determining fact questions, our responsibility is to review the record as a whole to determine whether the Board's factual determinations are supported by substantial evidence.

> "This analysis requires the court to (1) review evidence both supporting and contradicting the agency's findings; (2) examine the presiding officer's credibility determinations, if any; and (3) review the agency's explanation as to why the evidence supports its findings. The court does not reweigh the evidence or engage in de novo review. [Citations omitted.]" *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014).

Under K.S.A. 2017 Supp. 44-508(f)(2), "[a]n injury is compensable only if it arises out of and in the course of employment." In *Rinke v. Bank of America*, 282 Kan. 746, 752, 148 P.3d 553 (2006), the Kansas Supreme Court explained the difference between arising out of the employment and occurring in the course of employment:

> "'The two phrases arising "out of" and "in the course of" employment, as used in our Workers Compensation Act, K.S.A. 44-501 *et seq.*, have separate and distinct meanings; they are conjunctive, and each condition must exist before compensation is allowable. The phrase "*out of* " employment points to the cause or origin of the worker's accident and requires some causal connection between the accidental injury and the employment. An injury arises "out of" employment when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Thus, an injury arises "out of" employment if it arises out of the nature, conditions, obligations, and incidents of the employment. The phrase "*in the course of* " employment relates to the time, place, and circumstances under which the accident occurred and means the injury happened while the worker was at work in the employer's service. [Citations omitted.]'"

Here, the second condition—in the course of employment—is not an issue. Cumberland acknowledged Fishman was on U.S.D. 229 property and "on the clock" at

7

the time of the injury. The only issue is whether Fishman's injury arose out of her employment.

U.S.D. 229 argues Fishman was not performing her regular job duties at the time of her accident and therefore is not entitled to compensation. It contends her job required her to be in "close connection" with Julia, and Fishman was not within Julia's radius when the injury occurred. U.S.D. 229 asserts "simply monitoring" Julia was insufficient for the completion of Fishman's job description. In contrast, Fishman argues her injury arises out of her employment because she was supervising Julia while also interacting with other students, peers, and paraprofessionals. Fishman asserts she had a full view of Julia while Julia was on her bicycle.

After a careful review of the record we concur with the Board's conclusion that Fishman's injury arose out of her employment. On one hand, U.S.D. 229 is correct in pointing out that Cumberland's deposition testimony and the comments attributable to Julia's teacher both suggest that staying closely by Julia's side was part of Fishman's job duties. This is buttressed by Reid's testimony that he would have been on the floor near Julia if he had been assigned to her. On the other hand, Reid also acknowledged that other paraprofessionals observe Julia differently.

But for us, the most compelling evidence is Fishman's uncontroverted testimony that she had received no training on how to perform her job during gym class. As Fishman understood it, her job during gym class was to watch Julia and interact with Julia and other students. This is also consistent with Reid's testimony, which indicated the job of a paraprofessional during gym class was to ensure the safety of the students and interact with them. Although Julia's teacher indicated Fishman needed to be right next to Julia instead of playing catch with Reid, this conversation occurred *after* the injury. Fishman also indicated she was watching Julia from the bleachers and would be able to reach Julia in 8 to 10 seconds if Julia needed assistance. Thus, there is undisputed

8

evidence in the record which clearly demonstrates that Fishman believed she was appropriately performing her job duties at the time of her injury.

Further, Fishman's job duties were to ensure Julia's safety and assist her as needed. Fishman was responsible for Julia's welfare, not responsible for staying beside Julia. In *Servantez* the panel distinguished between performing forbidden work and performing work in a forbidden manner. 32 Kan. App. 2d 305, Syl. ¶ 6. At worst, Fishman was performing her job duties in a forbidden manner. Thus, substantial competent evidence supports the Board's finding that Fishman's injury arose out of her employment.

*U.S.D. 229's allegations of horseplay*

U.S.D. 229 also argues Fishman's injury is not compensable because it was the result of horseplay. In response, Fishman contends that the activity that caused her injury was not horseplay. Alternatively, she also contends that even if throwing of the football was considered horseplay, she was not a voluntary participant.

The ALJ found Fishman was a "willing participant in a sportive event." As such, the ALJ held Fishman was not entitled to compensation. The Board reversed, finding the record did not support a finding that throwing the football back and forth constituted horseplay.

K.S.A. 2017 Supp. 44-501(a)(1)(E) disallows compensation for an injury if it results from "the employee's voluntary participation in fighting or horseplay with a co-employee for any reason, work related or otherwise." Somewhat surprisingly, there is no statutory definition of horseplay in Kansas, either under the workers compensation law or elsewhere. Likewise, we have been unable to locate any Kansas caselaw which specifically embraces a particular definition. Notably, our Supreme Court recently held that, in the context of a civil battery lawsuit, the idea of horseplay is a "nebulous concept"

9

which has "no legal meaning." *McElhaney v. Thomas*, 307 Kan. 45, Syl. ¶ 4, 56, 405 P.3d 1214 (2017). Turning to colloquial sources, the dictionary defines horseplay as "rough, boisterous play." Webster's New World College Dictionary 703 (5th ed. 2016).

In the context of our workers compensation caselaw, only a few cases consider whether the employee's injury resulted from horseplay. For example, in *Reed v. Walmart*, No. 99,019, 2008 WL 4416079 (Kan. App. 2008) (unpublished opinion), the claimant was seriously injured when he placed his foot on the side of a spinning tire that was mounted on a balancing machine. According to the technician using the balancing machine, Reed admitted he was trying to kick the tire to throw the balance readings off. The ALJ determined Reed was not entitled to compensation because he purposefully interfered with a coworker's performance of his assigned job duties, and the Board affirmed. Our court concluded there was substantial competent evidence to support the Board's horseplay finding because Reed was not assigned to use the tire balancer, the balancer was in operation, and Reed told another employee he was trying to disrupt the balancer. 2008 WL 4416079, at *5. Similarly, in *Robinson v. Goff Motors/George-Nielson Motor Co.*, No. 113,110, 2016 WL 757789 (Kan. App. 2016) (unpublished opinion), the claimant injured his knee during a physical encounter with another employee. The ALJ found Robinson was not entitled to compensation for his knee injury because he "bear-hugged" another employee and the other employee struggled with Robinson to free himself. The Board affirmed. Our court affirmed, in part because Robinson admitted to starting the horseplay. 2016 WL 757789, at *2.

Other cases have dealt with whether an injury resulting from horseplay was compensable. Although whether the conduct causing the injury was horseplay was not at issue in these cases, they provide other examples of conduct constituting horseplay. These cases include: *Coleman v. Swift-Eckrich*, 281 Kan. 381, 385, 130 P.3d 111 (2006) (dumping coworker out of her chair considered horseplay); *Neal v. Boeing Airplane Co.*, 161 Kan. 322, 326, 167 P.2d 643 (1946) (trying to lift and raise large rolls of waxed

10

paper above head constituted horseplay), *abrogated on other grounds by Coleman*, 281 Kan. 381; *White v. Stockyards*, 104 Kan. 90, 177 P. 522 (1919) (electric shock from electrically charged wire fastened to metal door constituted horseplay), *abrogated on other grounds by Coleman*, 281 Kan. 381; *Stuart v. Kansas City*, 102 Kan. 307, 310, 171 P. 913 (1918) (throwing mortar at coworker considered horseplay), *abrogated on other grounds by Coleman*, 281 Kan. 381.

In all of these cases the claimants stepped away from their job duties and interfered with their coworkers' abilities to do their job duties. The claimants also engaged in potentially hazardous activities. Neither of those situations is present here. First, as Fishman understood it, she was responsible for watching Julia and interacting with the students. Fishman was watching Julia from the bleachers and could reach Julia in 8 to 10 seconds if Julia needed assistance. The video showed Reid throwing the football to Fishman about 12 times in a nearly four-minute span before she broke her finger. This did not affect Fishman's ability to watch Julia and ensure her safety. As the Board noted, Fishman could have, and probably should have, been more involved in Julia's supervision, but she was engaged in her job. Playing catch with a football is distinguishable from the activities identified in our prior caselaw. Unlike placing one's foot on the side of a spinning tire balancer, bear-hugging, lifting a heavy object, throwing mortar at coworkers, or electrically shocking coworkers, throwing a football back and forth is unlikely to result in serious injury. Our conclusion on this was ironically buttressed at oral argument, when it was revealed that the general activity in physical education class that day was throwing the football. Thus, we have no hesitation in holding that playing catch with a football does not constitute horseplay.

Fishman also argues that, even if there was horseplay, she was not a voluntary participant. K.S.A. 2017 Supp. 44-501(a)(1)(E) only disallows compensation if the injured employee voluntarily participated in horseplay. Citing *Coleman* 281 Kan. at 389, Fishman argues she was not a voluntary participant in the horseplay because she did not

choose to step away from her status and responsibilities as an employee to engage in playful but hazardous conduct; she thought she was fulfilling her job duties by watching Julia.

Even so, Fishman was a willing participant in the game of catch. She repeatedly threw the football back to Reid. Before Reid threw the pass that resulted in her broken finger, the video showed Fishman holding her hands in the air—inviting Reid to throw her the ball. Nothing in the record suggests Fishman did not want Reid to throw her the football. If we were to assume that playing catch with a football constituted horseplay, the evidence clearly suggests Fishman was a voluntary participant. In such event, Fishman would not be entitled to compensation. Although Fishman's contention in this area lacks merit, we find there is substantial competent evidence in the record supporting the Board's finding that playing catch in this instance did not constitute horseplay, and therefore Fishman's contention is moot.

Affirmed.